IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY


LAUREEN BULL,                          :
                                       :
          Plaintiff,                   :  Civil Action No. 2:07-CV-02291
                                       :                 (DMC-MF)
     v.                                :
                                       :
UNITED PARCEL SERVICE, INC.,           :
                                       :
          Defendant.                   :


**PLAINTIFF'S TRIAL BRIEF**


David Zatuchni, Esq.
Zatuchni & Associates, LLC
287 South Main Street
(Route 29)
Lambertville, NJ 08530
(609)-243-0300

Counsel for Plaintiff
Laureen Bull


Dated:  October 26, 2009

TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . 1

LEGAL POSITION. . . . . . . . . . . . . . . . . . . . . .2

I.   MS. BULL IS ENTITLED TO HAVE THE JURY HEAR AND DECIDE HER
     CLAIM ARISING FROM DEFENDANT'S FAILURE TO REASONABLY
     ACCOMMODATE HER DISABILIT IN VIOLATION OF THE NEW JERSEY
     LAW AGAINST DISCRIMINATION. . . . . . . . . . . . . . 2

     A.   The Viscik Decision is Controlling. . . . . . . .2

     B.   Defendant Has Effectively Waived Any Argument That Ms.
          Bull That The Jury Cannot Decide A Failure To
          Accommodate Claim. . . . . . . . . . . . . . . 4

II.  Elements of Ms. Bull's "Failure To Accommodate" Claim . . 5

     A.   Legal Standard. . . . . . . . . . . . . . . . .5

     B.   Summary of Facts Establishing UPS's Liability . . . 10

III. ELEMENTS OF MS. BULL'S DISCRMIINATORY DISCHARGE CLAIM UNDER
     THE NEW JERSEY LAW AGAINST DISCRIMINATION. . . . . . . . 11

     A.   Legal Standard. . . . . . . . . . . . . . . . 11

     B.   Summary of Facts Establishing UPS's Liability . . . 13

IV.  ELEMENTS OF PLAINTIFF'S WORKERS' COMPENSATION RETALIATION
     CLAIM . . . . . . . . . . . . . . . . . . . . . . .18

     A.   Legal Standard. . . . . . . . . . . . . . . . 18

     B.   Summary of Facts Establishing UPS's Liability . . . 20

## **TABLE OF CITATIONS**

*Cases*

Carter v. AFG Industries Inc., 344 N.J.Super. 549
(App. Div. 2001) . . . . . . . . . . . . . . . . . .19

Cerracchio v. Alden Leeds, Inc., 223 N.J. Super. 435
(App. Div. 1988) . . . . . . . . . . . . . . . . 18-20

Clowes v. Terminix Int'l Inc., 109 N.J. 575 (1988) . . . . . .12

Lally v. Copygraphics, 173 N.J.Super. 162
(App. Div. 1980) . . . . . . . . . . . . . . . . .18

LaResca v. American Tel. & Tel., 161 F.Supp.2d 323
(D.N.J 2001 ) . . . . . . . . . . . . . . . . . . 5

Leshner v. McCollister's Transportation Systems, Inc., 113
F.Supp.2d 689 (D.N.J. 2000) . . . . . . . . . . . . . 14

Maher v. New Jersey Transit Rail Operations, Inc., 125 N.J. 455,
(1991) . . . . . . . . . . . . . . . . . . . . .12

Melick v. Township of Oxford, 294 N.J.Super. 386
(App. Div. 1996). . . . . . . . . . . . . . . . . 13

Mengine v. Runyon, 114 F.3d 415 (3d Cir. 1997) . . . . . . . . 8

Seiden v. Marina Associates, 315 N.J.Super. 451
(Law Div. 1998) . . . . . . . . . . . . . . . . .2

Skerski v. Time Warner Cable Company, 257 F.3d 273
(3d Cir. 2001) . . . . . . . . . . . . . . . . . 15

Svarnas v. AT&T Communications, 326 N.J. Super. 59
(App. Div. 1999) . . . . . . . . . . . . . . . . 3, 12

Tynan v. Vicinage 13 of the Superior Court on N.J., 351 N.J.
Super. 385 (App. Div. 2002) . . . . . . . . . . . . 6, 7

Taylor v. Phoenixville School District, 184 F.3d 296
(3rd Cir. 1999) . . . . . . . . . . . . . . . . .6, 7

Viscik v. Fowler Equipment Company Inc., 173 N.J. 1 (2002) . . 2

Williams v. Pemberton Twp. Public Schools, 323 N.J.Super. 490
(App.Div. 1999). . . . . . . . . . . . . . . . . . . . .. 12

Young v. Hobart West Group, 385 N.J.Super. 448
(App. Div. 2005) . . . . . . . . . . . . . . . . . . . .12

Zive v. Stanley Roberts, Inc., 182 N.J. 436 (2005) . . . . . . 6

**Statutes**

N.J.A.C. 3:13-2.5(b)(1) . . . . . . . . . . . . . . . . . . .9

N.J.A.C. 3:13-2-5(b)(2) . . . . . . . . . . . . . . . . . . .9

N.J.A.C. 13:13-2.8(a)(1) . . . . . . . . . . . . . . . . . . 9

N.J.S.A. 10:5-29.1. . . . . . . . . . . . . . . . . . . . 11

N.J.S.A. 34:15-39.1. . . . . . . . . . . . . . . . . . .18

**PRELIMINARY STATEMENT**

Plaintiff Laureen Bull was a 20-year employee with Defendant United Parcel Service ("UPS"). Ms. Bull suffered a workplace injury in December 2005, for which she filed for workers compensation benefits.

In April 2006, Ms. Bull was summarily terminated by Defendant. Defendant claims that Ms. Bull could not perform the essential functions of her job as a Sorter because she was purportedly not medically cleared to lift 70 pounds. However, Defendant UPS failed to engage in any interactive process for determining a reasonable accommodation to Ms. Bull. Moreover, Ms. Bull <u>was</u> able to meet the essential function of her job and was medically cleared to lift over 50 pounds and up to 70 pounds.

Ms. Bull's asserts claims for (1) "failure to provide reasonable accommodation" in violation of the New Jersey Law Against Discrimination ("LAD"), (2) discriminatory termination due to disability in violation of the LAD, and (3) retaliation for seeking working compensation benefits.

Brief below are the legal requirements that Ms. Bull has to prevail on her claims, and a factual summary in support of those claims. Also briefed below is the issues of whether Ms. Bull is able to bring her "failure to accommodate" claim to the jury,

which Defendant apparently now contests on the basis of Ms. Bull's purported failure to affirmatively plead this claim.

**LEGAL POSITION**

**I.   MS. BULL IS ENTITLED TO HAVE THE JURY HEAR AND DECIDE HER CLAIM ARISING FROM DEFENDANT'S FAILURE TO REASONABLY ACCOMMODATE HER DISABILIT IN VIOLATION OF THE NEW JERSEY LAW AGAINST DISCRIMINATION**

Defendant UPS has now taken the position in this case that Ms. Bull has not pled a "failure to accommodate" claim as a separate cause of action and therefore is precluded from having the jury hear instructions on or decide such claim.  Defendant's argument is without merit as a matter of law.

**A. The _Viscik_ Decision is Controlling**

First, this precise issue as to when a failure to accommodate claim can be heard by a jury was decided in <u>Viscik v. Fowler Equipment Co.</u>, 173 N.J. 1, 20 (2002).  The Court held as follows:

> "Reasonable accommodation is only an issue in a handicap discrimination case **in two instances.** The first is the case in which a plaintiff affirmatively pleads failure to reasonably accommodate as a separate cause of action. *See, e.g., Seiden v. Marina Associates,* 315 *N.J.Super.* 451, 462, 718 *A.2d* 1230 (Law Div.1998) (quoting *Wooten v. Acme Steel Co.,* 986 *F.Supp.* 524, 526-27 (N.D.Ill.1997) (noting there are 'two distinct categories of disability discrimination' claims: (1) 'a claim alleging discrimination ... including a failure to reasonably accommodate an employee's known disability' and (2) 'a claim for disparate treatment discrimination, *i.e.,* treating a disabled employee differently ... because of his disability') (citations omitted)). **The second is the case in which an employer, rather than defending on the grounds that the employee was terminated for legitimate, non-**

> **discriminatory reasons, proffers the employee's inability
> to perform the job as a defense.** *See, e.g., Svarnas v. AT &
> T Communications,* 326 *N.J.Super.* 59, 74-75, 740 *A.*2d 662
> (App.Div.1999) ('An exception to accommodation exists where
> an employer reasonably determines that an employee because
> of a handicap cannot presently perform the job even with an
> accommodation.')"
> <u>Viscik</u>, <u>supra</u>, at 19-20. (emphasis added)

This "second" situation described in <u>Viscik</u> is precisely the
circumstance here.  There is no dispute that UPS has at all
times defended it conduct with respect to Ms. Bull by asserting
that Ms. Bull could not continue to work for UPS because she was
purportedly unable to perform the essential functions of her job
duties as a sorter because of her medical disability. <u>See</u> <u>e.g.</u>
Defendant Summary Judgment Brief at 12 ("It is uncontested that
on April 4 2006, Liposky told Bull that she could not work due
to issues relating to her medical restrictions, and plaintiff
did not report to work for UPS after April 4, 2006.  Liposky
dep., 43:4-6") ("Assuming That Plaintiff's Allegations That UPS
'Terminated' Her Job Is True, UPS Had Every Right To Do So Since
Plaintiff Cannot Perform The Essential Functions Of Her Job")

In short, Defendant has at all times proffered Ms. Bull's
"inability to perform" her job due to her medical condition as a
defense in this case.  Under <u>Viscik</u>, as a matter of law, Ms.
Bull may accordingly assert that UPS failed to reasonably
accommodate her disability.

**B.    Defendant Has Effectively Waived Any Argument That Ms. Bull That The Jury Cannot Decide A Failure To Accommodate Claim**

In both its initial Summary Judgment Brief, Defendant acknowledged that although "not specifically plead, UPS anticipates that Plaintiff will argue that UPS did not 'reasonably accommodate' her alleged disability." Def. Sum. Judg. Brief at 26.  After acknowledging its *own* understanding that Ms. Bull was asserting a failure to accommodate claim in this case, Defendant then went argue on the underlying merits. (Given its defense that Ms. Bull could not medically perform her job), at no place in its Brief did Defendant argue that Ms. Bull was precluded as a matter of law from even asserting such a claim because it was not separately pled.  Likewise, Defendant also did not raise such an argument in its Reply papers.

In short, Defendant at all times understood that Ms. Bull was asserting a failure to accommodate claim, and failed to argue that such a claim was precluded because it was purportedly not pled on summary judgment, which was the appropriate time to make all legal argument disposing of Ms. Bull's claims.  Given the above, Defendant cannot now argue that the jury is precluded from deciding a failure to accommodate claim because it was insufficiently pled in the Complaint.

## II.  Elements of Ms. Bull's "Failure To Accommodate" Claim

Ms. Bull asserts that Defendant UPS failed to reasonably accommodate her disability in violation of the New Jersey Law Against Discrimination.

### A.  Legal Standard

The LAD prohibits "any unlawful discrimination against any person because such person is or has been at any time disabled or any unlawful employment practice against such person, unless the nature and extent of the disability reasonably precludes the performance of the particular employment." N.J.S.A. 10:5-4.1.

Under the LAD, an employer must make a reasonable accommodation to the limitations of a disabled employee or applicant, unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of its business. LaResca v. American Tel. & Tel., 161 F.Supp.2d 323, 329 (D.N.J. 2001); N.J.A.C. 13:13-2.5(b).

In order to make a *prima facie* claim for a failure to accommodate claim, Ms. Bull must show that (1) she was disabled within the meaning of the law; (2) she was qualified to perform the duties of his position and had been performing his or her work at a level that met UPS legitimate expectations; and (3) she nevertheless had been fired. LaResca v. American Tel. & Tel., 161 F.Supp.2d  323, 329 (D.N.J. 2001)

In this case, given Defendant's own defense that Ms. Bull was not capable of performing her essential work functions due to a medical condition, there is <u>no</u> dispute that Ms. Bull was disabled within the meaning of the LAD.

Similarly, under the standard set forth in <u>Zive</u> there is no dispute that Ms. Bull has met her second prong given that she had been employed by UPS as a Sorter for twenty years. <u>Zive v. Stanley Roberts, Inc.</u>, 182 N.J. 436, 455 (2005)(to prove that she was performing at a level that met the employer's expectations for her *prima facie* claim, all that Ms. Bull has to do to prove this element is to show that she performed in the position up to the time of termination).

Defendant does allege that it did not technically "terminate" Ms. Bull, but there is <u>no</u> dispute that UPS did <u>not</u> allow Ms. Bull to continue working at UPS after April 4 2006 because she purportedly had not been medically cleared to lift 70 pounds (which is disputed). Accordingly, for purposes of a failure to accommodate claim, there is no dispute that Ms. Bull has not been allowed to work at UPS due to her medical condition.

Accordingly, there should be no real dispute that Ms. Bull makes her *prima facie* case.

In order to assess whether an accommodation is necessary, the employer must initiate an informal interactive process with

the employee.  Tynan v. Vicinage 13 of the Superior Court on
N.J., 351 N.J. Super. 385, 400 (App. Div. 2002); See also Victor
v. State of New Jersey, 401 N.J. Super. 596, 613 (App. Div.
2008).  Both parties have a duty to assist in determining
whether there are reasonable accommodations available. Taylor v.
Phoenixville School District, 184 F.3d 296, 312 (3rd Cir. 1999).
Further, both parties must act in good faith. Id.  A party that
obstructs or delays the interactive process, or fails to
communicate either by failing to initiate or failing to respond,
may be acting in bad faith. Id.

     Once an employer knows of the disability and the employee's
desire for accommodations, at that point the burden is on the
employer to request additional information the employer needs.
Id. at 314.

     Requests for reasonable accommodation need not be in
writing nor does the employee need to use the phrase "reasonable
accommodation".  Tynan v. Vicinage 13 of the Superior Court on
N.J., 351 N.J. Super. 385, 400 (App. Div. 2002) (citation
omitted).  An employee need only make clear that assistance is
needed for his or her disability. Id.

     The purpose of the interactive process is to determine the
appropriate accommodations.  Taylor v. Phoenixville School
District, 184 F.3d 296, 312, 316 (3rd Cir. 1999).  This includes,
identifying the precise limitations resulting from the

disability. Id., citing to 29 C.F.R. § 1630.2(o)(3). Both

parties must participate in the process because each party

possesses information the other does not have or cannot easily

obtain. Id. For example, the employer will often hold more

information than the employee about what adjustments are

feasible in the employee's current position. Id. An employer

"…cannot escape its duty to engage in the interactive process

simply because the employee did not come forward with a

reasonable accommodation that would prevail in litigation." Id.

at 317. Employers can show good faith by demonstrating that the

employer met with the employee, or requested information about

the condition and what limitations the employee has. Id. The

employer can also show good faith by showing it asked the

employee what he or she specifically wants and by showing some

sign of having considered the employee's request. Id. The

employer can also discuss alternatives with the employee when

the request for accommodation is too burdensome. Id. When an

employer fails to engage in the interactive process, it may not

discover a way in which the employee's disability could have

been reasonably accommodated, risking a violation of the law.

Id., citing to Mengine v. Runyon, 114 F.3d 415, 420-21 (3d Cir.

1997).

New Jersey law requires that "An employer shall consider

the possibility of reasonable accommodation before firing,

demoting or refusing to hire or promote a person with a disability on the grounds that his or her disability precludes job performance." N.J.A.C. 3:13-2-5(b)(2). (emphasis added)

Examples of reasonable accommodation include: "…a) making facilities used by employees readily accessible and usable by people with disabilities; b) job restructuring, part-time or modified work schedules or leaves of absence; c) acquisition or modification of equipment or devices; and, d) job reassignment and other similar actions." N.J.A.C. 3:13-2.5(b)(1).

In determining whether an accommodation would impose undue hardship on the operation of an employer's business, factors to be considered include:

i. The overall size of the employer's business with respect to the number of employees, number and type of facilities, and size of budget;

ii. The type of the employer's operations, including the composition and structure of the employer's workforce;

iii. The nature and cost of the accommodation needed; and

iv. The extent to which accommodation would involve waiver of an essential requirement of a job as opposed to a tangential or non-business necessity requirement. N.J.A.C. 3:13-2.5(b)(3).

Finally, any defense that that employee cannot perform the essential functions of the job even with reasonable accommodation, "must be based upon an objective standard

supported by factual evidence rather than general assumptions
that the handicap would interfere with the employee's inability
to perform the job." N.J.A.C. 13:13-2.8(a)(1).

   B. **Summary of Facts Establishing UPS's Liability**

   The evidence in this case will show that UPS never even
initiated, let alone engaged, in any interactive process
whatsoever to determine a reasonable accommodation, if possible,
for Ms. Bull.

   After Ms. Bull's injury, she was placed on "alternative
work" for short period of time, and then was placed to work on
Small Sorts line, which involved the handling of small and light
packages.  Despite this assignment on the Small Sort that Ms.
Bull was fully able to handle and _did_ handle, there is no
dispute that on April 4, 2006, UPS nevertheless summarily told
Ms. Bull that she could no longer continue to work for UPS
because she had not been "medically cleared" to do so.

   At _no_ time did UPS initiate any type of interactive process
with Ms. Bull to determine if she could continue working for UPS
with a reasonable accommodation.  Defendant's position at all
times, including in this litigation, is that Ms. Bull was not
medically cleared to lift 70 pounds and therefore _there was
nothing else to talk about_ and no interactive process was even
necessary.

At no time did UPS engage in any interactive process with Ms. Bull to determine if Ms. Bull's duties in Small Sorts actually entailed lifting 70 pounds.  For example, even UPS does not dispute that Ms. Bull could lift 50 pounds.  There was no discussion whether this was sufficient for the work actually performed by Ms. Bull.

At no time did UPS engage in any interactive process with Ms. Bull to determine if lifting 70 pounds was actually a purported "essential function" of her job as a Sorter or in Small Sorts.

At no time did UPS engage in any interactive process with Ms. Bull to determine if Ms. Bull could reasonably be assisted in lifting heavy packages.

At no time did UPS engage in any interactive process whether there was an opportunity for "job restructuring" or reassignment that would not have imposed an undue hardship on UPS.

Rather than fulfilling it explicit obligations under the LAD, UPS simply terminated a twenty year employee, Ms. Bull, because she could *purportedly* no longer lift 70 pounds.

**III. ELEMENTS OF MS. BULL'S DISCRMIINATORY DISCHARGE CLAIM UNDER THE NEW JERSEY LAW AGAINST DISCRIMINATION**

**A.   Legal Standard**

As set forth in N.J.S.A. 10:5-29.1,

"Unless it can be ***clearly*** shown that a person's disability would prevent such person from performing a particular job, it is an unlawful employment practice to deny to an otherwise qualified person with a disability the opportunity to obtain or maintain employment, or to advance in position in his job, solely because such person is a person with a disability or because such person is accompanied by a service or guide dog." (emphasis added).

A plaintiff bringing a discriminatory discharge claim based on disability carries the burden of establishing a *prima facie* case. Svarnas v. AT&T Communications, 326 N.J. Super. 59, 73 (App. Div. 1999).   Establishing the *prima facie* case includes demonstrating the following four elements:  a) plaintiff was handicapped; b) plaintiff was performing at a level that met the employer's expectations; c) employee was fired; and, d) employee sought someone to perform the same work.  Id., citing to Maher v. New Jersey Transit Rail Operations, Inc., 125 N.J. 455, 480-81 (1991) and Clowes v. Terminix Int'l Inc., 109 N.J. 575, 596 (1988). Courts have held that a plaintiff can meet the fourth prong by showing that the termination took place under "circumstances that give rise to an inference of discrimination." Young v. Hobart West Group,  385 N.J.Super. 448, 463 (App. Div. 2005); Williams v. Pemberton Twp. Public Schools, 323 N.J.Super. 490, 502 (App.Div.1999).

The first three prongs of this prima facie case are the same as the "failure to accommodate" claims and are discussed above.

The fourth prong will be met by the overall fact and circumstances of the case together with the evidence of pretext discussed below.

Once the prima face case is made, it is the employer's burden to assert a legitimate non-discriminatory reason for its adverse action against the employee. UPS has asserted as its legitimate reason for terminating Ms. Bull the purported fact that she was not medically cleared to lift 70 pounds.

A jury can find in favor of Ms. Bull on her disparate treatment claim if it finds that this asserted justification by UPS was merely a pretext for discrimination. Melick v. Township of Oxford, 294 N.J.Super. 386, 394 (App. Div. 1996).

**B.   Summary of Facts Establishing UPS's Liability**

Defendant contends that Ms. Bull could not perform the essential functions of her job because Dr. Theresa Vega's March 29th medical note restricted Plaintiff from performing her job duties. Def. Sum. Judg. Brief at Pg. 25. Defendant relies upon UPS' written job description for Ms. Bull's position, requiring that an employee in the Smalls Sort position be able to lift, pull, manipulate, etc. a minimum of 70 pounds, in arguing that Dr. Vega's March 29th medical note prevented Ms. Bull from performing the essential functions of her job.   Id.

First, in this case, the essential functions of Ms. Bull's position are in dispute.   There are two (2) job descriptions

13

available for the Smalls Sort position held by Ms. Bull at the time of her termination.  Zatuchni Cert. at Exh's AA, BB.[1]  The official job description for a general Smalls Sort employee, states the employee must be able to  "Lift/lower, push/pull manipulate and carry containers weighing up to 70 pounds and packages weighing up to 10 pounds".  Zatuchni Cert. at Exh. AA. The other job description produced by UPS in this matter, for Smalls Sort "Debagging", states the employee must be able to "continuously lift/lower, push/pull, manipulate and carry containers weighing up to 70 pounds."  Zatuchni Cert. at Exh. BB.  Also, both job descriptions state at the bottom, "the essential functions of this job may ***vary greatly*** depending upon the size and locations of the UPS facility.  At some locations, employees may not perform all of the essential job functions listed above.  At other locations, employees may perform some or all of the functions listed above and, in addition, may be required to perform other jobs or tasks as directed."  Id.

While consideration shall be given to the employer's judgment as to what job functions are essential, the Court should be careful of employers who define the essential functions of a job in a way that is itself discriminatory. Leshner v. McCollister's Transportation Systems, Inc., 113

---

[1]    All fact citations herein refer to the Plaintiff's papers filed in Opposition to Defendant's Motion for Summary Judgment

F.Supp.2d 689, 692 (D.N.J. 2000).   Further, the Court should be mindful of situations where the duties of plaintiff's position are not well defined, or where employee job duties are frequently shifted or transferred.   Id. at 692-93.   Whether a particular job function is essential is a factual determination that must be made on a case-by-case basis.   Skerski v. Time Warner Cable Company, 257 F.3d 273, 279 (3d Cir. 2001).

Taking the above job descriptions into account, along with the evidence in the record regarding Ms. Bull's actual job duties at the UPS Edison warehouse in which she worked, demonstrates that Ms. Bull was still able to perform the essential duties of her job, even with the ten (10) pound overhead lifting restriction placed on her by Dr. Vega.

Dr. Vega's medical note only restricted Ms. Bull as to overhead lifting, no greater than ten (10) pounds. Vega Medical File (at LB21), Zatuchni Cert. at Exh.V; Vega Dep. at 89:1 - 91:5, Exh. X.   When Ms. Bull returned to work after receiving Dr. Vega's March 29th medical note, she was assigned to the Smalls Department, under Supervisor Janet Liposky, to work as a bagger.   Bull Dep. at 177:5 - 178:24, Exh. B; Complaint at ¶ 72. Ms. Bull testified that as a bagger, she would scan packages that were separated into bins, drop the packages into a bag that was below her waist, and, then, after the bag reached a certain limit/weight, would drag the bag to a conveyer belt that was

below her knees.  Bull Dep. at 179:18 – 182:16, Exh. B; Liposky Dep. at 33:5 – 35:6, Exh. Y.  Ms. Bull did <u>not</u> have to lift these packages over her head that she was handling in the Smalls Department.  <u>Id</u>.  Each package weighed ten (10) pounds. Bull Dep. at 179:18 – 182:16, Exh. B.  This is confirmed by Ms. Bull's co-worker, Linda Hollinger.  Ms. Hollinger, an employee of UPS for over twenty (20) years, has worked for UPS in the Smalls Sort Department and has also worked as a Scanner.  Ms. Hollinger confirms that the packages in the Smalls Department have a sort weight of 10 pounds and that overhead lifting is not necessary in order to do the job. Hollinger Cert. at ¶¶ 1-3; 19-20.  Further, Ms. Bull performed her job duties as a bagger for a total of five (5) days, until April 4, 2006, without any difficulty, until terminated abruptly on April 4, 2006. <u>Id.</u> and Bull Dep. at 27:13 – 32:18, Exh. B.

Therefore, UPS' contention that Dr. Vega's over-head lifting medical restrictions prevented Ms. Bull from performing the essential duties of her job, because it prohibited her from lifting up to seventy (70) pounds—a requirement set forth in UPS' job description for Smalls Sort, is false. The evidence shows that as a bagger in Small Sorts, at the Edison Warehouse, Ms. Bull did not have to lift any bags over her head.  In fact, Ms. Bull performed her job duties in this position for a week, without needing to lift any bags over her head.  A co-worker of

Ms. Bull confirms that when she held this very same position, she did not have to lift any bags over her head.  Therefore, a jury can find that there was no real medical restrictions on Ms, Bull's actual job duties.

Furthermore, Ms. Bull had submitted medical documentation which allowed her to lift over fifty (50) pounds and up to 70 pounds.  Farber 6/13/06 Note, Zatuchni Cert. at Exh. JJ; Dr. Farber 8/14/2006 Note, Exh. PP; UPS Dr. Farber File (at D722), Exh. MM.  It is Plaintiff's contention that considering her job duties at the time of her termination, which included lifting packages that were ten (10) pounds and dragging bags holding small packages that could weigh up to seventy (70) pounds, both of Dr. Farber's notes allowed Ms. Bull to return to work as a Smalls Sort Bagger.

UPS self-servingly chose to disregard the very medical note produced by Ms. Bull that fully complied with all weight restrictions and duties outlined in the Job Description for Smalls Sort.  In order to avoid having to continue to employ Ms. Bull, UPS conveniently accepted as valid an Essential Job Functions Worksheet (but dated earlier than the August 14, 2006 medical note submitted by Ms. Bull) restricting Ms. Bull to lifting fifty (50) pounds, but then categorically rejected the August 14, 2006 note from the same medical practice.

Furthermore, Defendant also refused to have Ms. Bull re-evaluated by a neutral third-party physician or to even have her reevaluated by UPS's *own* physician.

The evidence in this case is that it was not at all "clear" to UPS that Ms. Bull could not perform the essential function of her job, particularly given that Ms. Bull provided medical documentation that she could lift over 50 and up to 70 pounds. UPS assertion that it could no longer continue to employ Ms. Bull because she could not lift 70 pounds is a pretext for its discriminatory animus.

## IV.   ELEMENTS OF PLAINTIFF'S WORKERS' COMPENSATION RETALIATION CLAIM

### A.   Legal Standard

According to N.J.S.A. 34:15-39.1:

> "It shall be unlawful for any employer or his duly authorized agent to discharge or in any other manner discriminate against an employee as to his employment because such employee has claimed or attempted to claim workmen's compensation benefits from such employer…"

A common law claim for retaliatory discharge based on public policy grounds, due to the discharge of an employee in retaliation for filing a workers' compensation claim, was recognized in Lally v. Copygraphics, 173 N.J.Super. 162 (App.Div.1980), aff'd, 85 N.J. 668 (1981). In order to make a *prima facie* case for retaliatory discharge based on the filing of her workers' compensation claim, Ms. Bull must establish: 1)

she made or attempted to make a claim for workers' compensation;
and, 2) she was discharged in retaliation for making that claim.
Cerracchio v. Alden Leeds, Inc., 223 N.J. Super. 435, 442 (App.
Div. 1988).

Defendant does not dispute the first element of Ms. Bull's
*prima facie* case—that she made a claim for workers' compensation
benefits.  See Def. Sum Judg. Brief at Pgs 35-38.  In any event,
it is undisputed that Ms. Bull reported her injury to UPS, that
an accident report was filled out and that Ms. Bull was provided
workers' compensation benefits through UPS' workers compensation
carrier, Liberty Mutual.  See Counter SOF at ¶¶ 42 to 72. As
conceded in Defendant's statement of facts, Ms. Bull was granted
workers' compensation leave from UPS.  See Defendant's SOF at ¶
29.

Furthermore, attendance at medical appointments constitutes
the claiming of compensation benefits and no formal workers'
compensation claim petition is required to be filed to invoke
the protection of the statute prohibiting discrimination against
an employee claiming workers' compensation benefits. Carter v.
AFG Industries Inc., 344 N.J.Super. 549 (App. Div. 2001), cert.
denied, 171 N.J. 340.  As further held in Cerracchio v. Alden
Leeds, Inc., 223 N.J. Super. 435, 443 (App. Div. 1988), a
plaintiff puts into motion the filing of a workers' compensation
claim by notifying the employer of the injury and inquiring as

to the procedure to be followed to have his hospital bills paid. The court also took into consideration in Cerracchio that on the same day plaintiff called his employer, a report of the accident was made to defendant's workers' compensation carrier by defendant. Id. at 442-443. The fact that Ms. Bull's workers' compensation attorneys did not file the formal petition until one (1) month later is irrelevant. UPS was well aware of Ms. Bull's workers' compensation claim following her December 2005 injury and its carrier, Liberty Mutual was in the process of handling said claim, prior to Ms. Bull's termination. UPS' Health and Safety Specialist, Michelle Blanchard, completed forms send to her and process by Liberty Mutual. See Counter SOF at ¶¶ 42 -55.

In Cerracchio, the Appellate Division observed that how the Defendant treated the plaintiff following his accident, along with legitimate inferences, was sufficient to sustain a judgment that plaintiff was fired for filing the workers' compensation claim. Cerracchio v. Alden Leeds, Inc., 223 N.J. Super. 435, 443 (App. Div. 1988).

**B.    Summary of Facts Establishing UPS's Liability**

Defendant has argued that Ms. Bull cannot meet the "causation" element of her *prima facie* claim. In truth, Ms. Bull is able to point to an abundance of evidence demonstrating that she was terminated due to the fact she had another on-the-job

injury and was seeking compensation from Defendant's workers compensation carrier.

First, the hostility towards Ms. Bull by her full-time Supervisor, Dave Thomas, immediately after she requested treatment for her on-the-job injury, is relevant. Further, Defendant failed to provide Ms. Bull with prompt medical treatment for her on-the-job injury, contrary to its own policies and procedures with respect to on-the-job injuries. Mr. Thomas refused to escort Ms. Bull to the company physician (approved by its workers' compensation carrier), repeatedly ignored and dismissed Ms. Bull and her injury, and only provided her with medical attention after she threatened Mr. Thomas with a lawyer.

Although Ms. Bull was provided treatment through UPS' workers' compensation carrier, the evidence reveals that UPS had suspicions over Ms. Bull's injury and Ms. Bull was further treated with hostility by UPS. Mr. Thomas, called the company doctor, and falsely wrote in a memo to Brian Bardi (Manager of PreLoad), that Dr. Vega had indicated she didn't think there was anything wrong with Ms. Bull's shoulder. Thomas Memo to Brian Bardi, Exh. U. This is refuted by Dr. Horvath's own medical records and diagnosis of Ms. Bull, and was denied by Dr. Horvath at her deposition. Horvath Medical File, Exh. O; Horvath Dep. at 68:19 - 71:1, Exh. P. Significantly, there is a memo, made

by UPS, shortly after Ms. Bull's December 2005 injury, dated January 5, 2006, in which UPS employee Richard Emery apparently research Ms. Bull's prior workplace accidents and injuries and documented this information to Mr. Bardi.  Emery Memo, Exh. U. One can only conclude that UPS was reviewing and taking note of Ms. Bull's injury history, when evaluating and making employment decisions as to her December injury.  Id.

Further, Mr. Thomas failed to complete the Injury Investigation and Prevention Report on Ms. Bull's injury.  The completion of this document is required pursuant to UPS' Injury Employee Guide.  Injured Employee Guide at Pg. 4, Exh. I. Contrary to UPS' practices and policies, Mr. Thomas never investigated Ms. Bull's workplace accident, nor did he take any steps whatsoever to collect the appropriate information Ms. Bull's December 2005 workplace injury.  See Injury Investigation and Prevention Report, Exh. L and Blanchard Dep. at 83:5 - 88:11, Exh. M.  Mr. Thomas neglected to provide easily obtainable and essential information pertaining to Ms. Bull's injury, such as the location of the injury, the nature of the injury, whether there were witnesses to the accident, what behavior Ms. Bull was engaged in at the time of injury, what the conditions were at the time of the injury and/or what prevention activity was appropriate or should be taken in light of her injury. Id.  In fact, Ms. Bull's workplace accident was not

properly reported to UPS' workers' compensation carrier, Liberty
Mutual.  For instance, Ms. Bull's injury was reported as having
occurred over a period of time, during the course of her normal
job duties while sorting packages.  It was also incorrectly
noted "[t]here was no one incident that caused the injury.
Injury was due to repetitive motion."  Further, the date of her
injury was listed as January 4, 2006.  See Initial On-Line
Injury Investigation Summary, Exh. N.  See also Blanchard Dep.
at 39:20 - 40:15; 43:15 - 49:11; 52:19 - 57:7; 60:6 - 70:9, Exh.
M.

In addition, although UPS placed Ms. Bull on its TAW
program (Temporary Alternate Work Program), Ms. Bull was given
duties outside her medical restrictions during this period of
time.  Despite Ms. Bull turning in her medical paperwork after
each visit to Mr. Thomas, she was assigned to the Smalls
Department and was asked to sort packages, contrary to the
weight limitation of her medical restrictions.  Bull Dep. at
139:4 - 153:20, Exh. B.  Ms. Bull brought this to the attention
of Dr. Horvath on 1/9/06.  Horvath Medical File (at D-7), Exh.
O; Horvath Dep. at 21:6 - 22:13, Exh. P.  See also Thomas Memo
to Brian Bardi, Exh. T.  Although Mr. Thomas notes this in his
memo to Brian Bardi, Mr. Bardi, nor did anyone else at UPS, ever
address this situation. Ms. Bull also informed the orthopedic
specialist that she was referred to, Dr. Theresa Vega of Edison-

Metchen Orthopaedic Group, about the fact that she was being assigned duties outside her medical restrictions.  Bull Dep. at 148:3-18; 154:2-24, Exh. B. Michelle Blanchard, the Safety Supervisor at UPS, was informed about this issue as well.  Id. and 152:3-20, Exh. B.

The manner in which Ms. Bull is terminated is also evidence that Ms. Bull was being terminated due to her claim for workers compensation benefits.  Once Ms. Bull is released by Dr. Vega and had reached maximum medical improvement (Dr. Vega had exhausted all treatment options for Ms. Bull), Ms. Bull is terminated almost immediately, told to leave the building, accused of having told Dr. Vega that she no longer worked for UPS, and is given no explanation by UPS behind its abrupt and sudden actions.  See Counter SOF at ¶¶ 81-104.  Ms. Bull, a near twenty (20) year employee, was escorted out of the Edison warehouse on April 4, 2006, without any explanation as to why she could no longer work for UPS, nor was she provided an notice or explanation of her rights or options.  None of Ms. Bull's supervisors/managers, no one in UPS' Human Resources Department or Benefits Department, not Mr. Bardi (the Division Manager)—no one at UPS provided Ms. Bull with any type of an explanation for UPS' actions on April 4, 2006.  Ms. Bull was treated harshly, was dismissed and was left with no other choice than to harass and badger various UPS' employees and her union, for an

explanation as to what had happened after being released to work by Dr. Vega.

The hostility displayed towards Ms. Bull, commencing immediately after her workplace injury in December 2005 and continuing through her termination on April 4, 2006, is sufficient to establish a claim that she was terminated because she pursued compensation benefits for her December 2006 on-the-job injury.

Respectfully submitted,

David Zatuchni   /s/
Zatuchni & Associates, LLC
287 South Main Street
(Route 29)
Lambertville, NJ 08530
(609) 243-0300
davidz@zatuchniassociates.com
Counsel for Plaintiff

Dated: October 26, 2009

25