THIS FORM IS TO BE RETYPED IN FULL INCLUDING ALL
INSTRUCTIONS AND ALL MATERIAL INSERTED IN PROPER SEQUENCE
AND NOT BY MEANS OF ATTACHED RIDERS EXCEPT AS
SPECIFICALLY PROVIDED BELOW.

---

(PLEASE NUMBER ALL PAGES)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| LAUREEN BULL | Civil Action No. 07-2291 |
| Plaintiff(s), | HON. DENNIS M. CAVANAUGH, U.S.D.J. |
| -vs- |  |
| UNITED PARCEL SERVICE, INC. | **FINAL PRETRIAL ORDER** |
| Defendant(s). |  |

A final pretrial conference having been held before the Honorable Patty Shwartz ~~Mark Falk~~, U.S.M.J., David Zatuchni, Esq., Zatuchini & Associates, having appeared for plaintiff, and Michael T. Bissinger, Esq., Day Pitney LLP, having appeared for defendant United Parcel Service, Inc. ("UPS" or defendant), the following Final Pretrial Order is hereby entered:

1.  **JURISDICTION**      (set forth specifically)

    1.  Upon the commencement of this action, as alleged in the Complaint, plaintiff was a resident of Union County in the State of New Jersey.  Thus, plaintiff is a New Jersey citizen.

-1-

2.   UPS is a corporation organized and incorporated in the State of New York, with its corporate headquarters and principal place of business located in Atlanta, Georgia. Therefore, UPS is a citizen of a State other than New Jersey.

3.   In this civil action, the remaining claims include disability discrimination (wrongful discharge), and retaliation (wrongful discharge) for filing a workers' compensation claim. Plaintiff is seeking compensatory damages, punitive damages and attorney's fees and costs.   The alleged amount sought exceeds the sum or value of $75,000 exclusive of interests and costs.

4.   Accordingly, per the above allegations, this Court has original jurisdiction over the action pursuant to 28 U.S.C. § 1332(a) based upon the parties' diversity of citizenship, and alleged damages in excess of $75,000.

2.  **PENDING/CONTEMPLATED MOTIONS**  (Set forth all pending or contemplated motions, whether dispositive or addressed to discovery or the calendar. Also, set forth the nature of the motion and the return date. If the Court indicated that it would rule on any matter at pretrial, summarize that matter and each party's position.)

The following motions will be filed by Plaintiff at a date to be set by the Magistrate Judge:

- Motion *in Limine* to Bar Evidence Regard Prior Workers Compensation Claims By Plaintiff

The following motions will be filed by Defendant at a date to be set by the Magistrate Judge:

- Motion *In Limine* To Bar Various Evidence Including: (1) Evidence relating to plaintiff's dismissed claims and claims which plaintiff never plead, (2) The unfaxed and/or original copies two medical notes that were requested by UPS in September 2006, but never produced until this lawsuit; (3) Evidence of irrelevant conduct and stray remarks by non-decision makers, (4) Hearsay evidence by certain witnesses that is not relevant and/or unduly prejudicial to UPS; and (5) Plaintiff's EEOC charge and related documents.

- Motion *In Limine* To Bar Plaintiff's Claims For Economic, Emotional Distress, Punitive Damages, And Equitable Relief.

- Motion *In Limine* To Bar Plaintiff's Damages Because Her Claims Are Preempted By Federal Labor Law.

*per the letter dated November 23, 2009, these issues → will be raised either at the close of plaintiff's case or the close of the evidence*

*The in limine motions shall be filed no later than January 15, 2010 and the opposition shall be filed no later than January 29, 2010. No replies are permitted.*

3.   **STIPULATION OF FACTS** (Set forth in numbered paragraphs all uncontested facts, including all answers to interrogatories and admissions, to which the parties agree.)

1.   United Parcel Service, Inc. ("UPS") hired Laureen Bull ("Ms. Bull") on June 2, 1986 as a part-time loader/unloader. (Certification of John Ganley ("Ganley Cert.") Ex. 3).[1]

2.   Ms. Bull has worked as a part-time, manual laborer throughout her employment with UPS. (*Id.*)

3.   Ms. Bull had a variety of assignments at UPS during her employment. (Plaintiff's Counter-Statement of Facts, ¶ 3).

4.   Ms. Bull was a member of the Teamsters union, Local 177. (Certification of Michael T. Bissinger ("Bissinger Cert."), Ex. 3, Bull dep. 15:23-16:2).

5.   In December 2005, Ms. Bull reported to part-time supervisor Arturo Serrano, who in turn reported to full-time supervisor Dave Thomas. (Thomas dep., 15:19-23 & 18:4-8).

6.   In late 2005, UPS management changed its operating plan for the Edison facility and decided to eliminate the part-time work on the "midnight sort." (Thomas dep., 46:13-47:10; Cherney dep., 13:20-25).

7.   The employees on the "midnight sort", including Ms. Bull were offered other work on other shifts. (Bull dep., 70:2-11).

8.   During the week of Christmas in 2005, Ms. Bull was assisting a co-worker in lifting a heavy package in excess of 70 pounds and the package fell on Ms. Bull and injured her. (Plaintiff's Counter Statement of Facts ¶ 12).

9.   Ms. Bull advised her supervisor, Arturo Serrano, of her injury shortly after it occurred. (Bull dep., 84:17-23).

---

[1] All citations relate to the papers submitted by the parties during the summary judgment motion.

10. Mr. Serrano advised full-time supervisor Dave Thomas of Ms. Bull's injury shortly after it occurred. (Bull dep., 86:5-88:9).

11. Ms. Bull returned to work on the day following her injury. (Bull dep., 94:18-21).

12. Ms. Bull reported to work for several days following her injury. (Bull dep., 95:13-96:12; 101:11-22; 111:25-112:5; 114:1-3; 116:5-9).

13. On January 4, 2006, Mr. Thomas met Ms. Bull at the office of Dr. Katalin Horvath. (Bull dep., 31:8-9; 122:18-123:16).

14. Dr. Horvath placed work restrictions on Ms. Bull prohibiting Ms. Bull from lifting, pushing, or pulling more than 25 pounds. (Bissinger Cert., Ex. 13).

15. Ms. Bull saw Dr. Horvath on several additional occasions during January 2006. On each visit, Dr. Horvath continued Ms. Bull's 25 pound weight restrictions. (Bissinger Cert., Exs. 16-20).

16. Ms. Bull subsequently received treatment from Dr. Teresa Vega, an orthopedist. Exs. 21-22; Vega dep. 12:10-12; 17:13-16).

17. On or about February 21, 2006, while Ms. Bull was still seeing Dr. Vega, she began a workers' compensation leave from UPS. During that leave Ms. Bull received workers' compensation benefits. (Bull dep., 101:4-6; 162:16-17).

18. Dr. Vega re-examined Ms. Bull on January 30, 2006, February 15, 2006, March 1, 2006, and March 15, 2006. (Bull dep., 154:6-19; 157:17-19; 160:3-161:18; 162:2-4; 165:19-23; 167:4-168:14; 170:2-22).

19. On March 29, 2006, Dr. Vega examined Ms. Bull and gave her a medical note. (Bissinger Cert., Ex. 33; Bull dep., 380:10-14).

20.  On March 29, 2006, after seeing Dr. Vega that day, Ms. Bull went to work at UPS.  (Bull dep., 177:13-16).  She reported to a new shift (twilight), and to a new supervisor, Janet Liposky.  (Bull dep., 177:13-16; Liposky dep., 17:18-20; 29:5-18).

21.  Ms. Bull worked for Ms. Liposky for a few days.  (Liposky dep., 35:10-15).

4. **CONTESTED FACTS** (Proofs shall be limited at trial to the contested facts set forth. Failure to set forth any contested facts shall be deemed a waiver thereof.)

   A.  **Plaintiff:**

   1.  Laureen Bull commenced working with UPS on June 2, 1986 as a part-time employee, working out of UPS' Edison facility.  Complaint at ¶ 5, 10, Zatuchni Cert. at Exh. A; Bull Dep. at 63: 2-20, Zatuchni Cert. at Exh. B; Bull Employee History Profile D00001, Zatuchni Cert. at Exh. C.

   2.  Ms. Bull remained employed with UPS, through April 4, 2006—a total of nineteen (19) years and ten (10) months. Complaint at ¶ 5, Exh. A; Bull Dep. at 63:2-20, Exh. B.

   3.  Ms. Bull held a variety of positions at UPS during her employment.  Ms. Bull worked in the Unload Department, Smalls Department and the Sort Aisle Department.  She worked as a loader/unloader, a dumper (a person that empties packages out of bags) and a sorter.  Bull Answers to Interrogatories at ¶ 9, Zatuchni Cert. at Exh. D.

   4.  For the majority of the time period relevant to this matter, Ms. Bull was working in the Sort Aisle Department as a Sorter.  As a Sorter, Ms. Bull was responsible for handling different sized packages and then sorting those packages onto the proper conveyor belt.  Bull Dep. at 64:3 - 67:3, Exh. B; Bull Answers to Interrogatories at ¶ 9, Exh. D.

   5.  As a Sorter, Ms. Bull worked the midnight shift, which generally started around midnight and ended between 3:30 a.m.

and 4:00 a.m.   Thomas Dep. at 15:10 – 17:10, Zatuchni Cert. at Exh. E; Bull Dep. at 68:15-24, Exh. B.

6.   During Ms. Bull's almost 20-year employment, she received several awards.  Ms. Bull received awards for perfect attendance.   On another occasion, she received an award for being the best missort person on the midnight shift.   Complaint at ¶ 11-13, Exh. A; Perfect Attendance Rewards, Zatuchni Cert. at Exh. F.

7.   Ms. Bull is and always has been a hard worker.   In fact, Ms. Bull worked several jobs during her employment with UPS.   Ms. Bull worked as a <u>full-time</u> operator for Frigidaire/Electrolux, for fifteen and a half (15 ½ ) years, from 1988 until August 2003, when she was laid-off due to the closing of the warehouse in which Ms. Bull worked.   From December 30, 2003 through the present, she has worked as a <u>full-time</u> Sales Associate at Wal-Mart.   Ms. Bull also sporadically worked as a substitute teacher and Principal for Elizabeth Board of Education, in 2005 and into early 2006.   Complaint at ¶¶ 7-9, Exh. A; Bull Answers to Interrogatories at ¶ 10, Exh. D; Bull Dep. at 73:9-23, Exh. B.

8.   During Ms. Bull's employment with UPS, while holding these other jobs with Wal-Mart and Frigidaire/Electrolux, she often worked 70 hours per week or more.   Bull Answers to Interrogatories at ¶ 10, Exh. D; Bull Dep. at 73:9-23, Exh. B.

9.   Ms. Bull intended to retire from UPS.   Ms. Bull enjoyed her job with UPS very much and wanted to "live out her dream there".   Bull Dep. at 11:23 – 12:19, Exh. B.

10.   Only two months shy of her 20-year anniversary with UPS, Ms. Bull was told she "no longer worked for UPS" and was ordered to leave the premises on April 4, 2006.   Ms. Bull was given no explanation behind these abrupt actions taken by UPS. Bull Dep. at 23:5-21; 27:13 – 31:13, Exh. B; Bull Charge of Discrimination, Zatuchni Cert. at Exh. G.

11.   Towards the end of December 2005, Ms. Bull suffered a serious workplace injury.   Bull Dep. at 20:10 – 21:16, Exh. B. At the time of Ms. Bull's injury, she was working in the Sort Aisle Department, as a Sorter.   <u>Id</u>. at 83:2-23.

-7-

12.   On the day in question, Ms. Bull and a co-worker named Bill Vactor, were both handling a large and heavy package containing a snowplow.   This package weighed in excess of seventy (70) pounds.  As Ms. Bull and Mr. Vactor were attempting to place the package on a belt above their heads, the package slipped from Mr. Vactor's hands and landed on Ms. Bull's right shoulder and neck area, causing her to fall backwards onto the ground.   When Ms. Bull fell to the ground, she fell on top of another package, which hit her in the right shoulder.   Id. at 20:10   –   21:16   and   83:2   –   84:16   ;   Bull   Supplemental Statement/Charge of Discrimination, Zatuchni Cert. at Exh. H.

13.   In accordance with company policy, Ms. Bull reported this workplace injury to the part-time Sort Aisle Supervisor, Arturo Serrano.   Mr. Serrano then contacted the full-time Sort Aisle Supervisor, Dave Thomas, on a walkie-talkie and informed him about the accident.   Bull Supplemental Discrim. Charge Letter, Exh. H; Bull Dep. at 84:17 – 86:25, Exh. B.

14.   It is company policy that a manager or supervisor either escort the injured employee to a medical facility, or meet the injured employee at the medical facility.   Thomas Dep. at 32:1 – 33:15, Exh. E; Injured Employee Procedure Reference Guide at Pg. 4, Zatuchni Cert. at Exh. I.

15.   Ms. Bull waited for Mr. Thomas to come speak to her about the workplace accident and refrained from working.   After waiting approximately a half-hour, Mr. Serrano informed Ms. Bull that she would have to go see Mr. Thomas up in the tower to discuss the accident.   Bull Dep. at 87:24 – 90:23, Exh. B; Bull Supp. Discrim. Charge Letter, Exh. H

16.   However, when Ms. Bull arrived at the tower, Mr. Thomas was not interested in discussing Ms. Bull's injury at all.   Instead, Mr. Thomas badgered Ms. Bull about her vacation time.   Finally, after Ms. Bull was forced to pick her vacation time, she went on to discuss the workplace accident and her injury.  Bull Dep. at 91:1 – 92:20, Exh. B.

17.   Mr. Thomas asked Ms. Bull if she wanted to go to the hospital.   Ms. Bull indicated that she wanted to see how she felt later in the day.   Ms. Bull was in pain, but she thought that pain would soon pass and that she would not need medical attention.   Bull Supp. Discrim. Charge Letter, Exh. H; Bull Dep. at 92:15 – 93:2, Exh.B.

-8-

18.   The next day, Ms. Bull returned to work and noticed that her neck and right arm were still in pain.   So, before starting her shift, Ms. Bull reported the continued pain to Mr. Serrano and requested to see the company doctor.   Mr. Serrano advised Ms. Bull that he would inform Mr. Thomas about the situation.   Bull Dep. at 94:12 - 95:12; 98:12-16, Exh. B.   Bull Supp. Discrim. Charge Letter, Exh. H.

19.   Mr. Miller, a co-worker of Ms. Bull, overheard Ms. Bull stating she was hurt and also asking Mr. Thomas for medical treatment.   Miller Dep. at 31:13 - 32:8; 50:4 - 51:25, Zatuchni Cert. at Exh. J; Clay Miller Certification at ¶¶ 8-9.   Another co-worker of Ms. Bull, Linda Hollinger, witnessed Mr. Dave Thomas giving Ms. Bull a hard time about wanting to go see the company's doctors.   Ms. Hollinger even states that Mr. Thomas was being nasty towards Ms. Bull and was acting like her injury was not a big deal.   Hollinger Cert. at ¶9.   Ms. Hollinger has witnessed hostility by UPS managers/supervisors towards employees suffering on-the-job injuries.   For instance, Ms. Hollinger has witnessed UPS managers and supervisors force employees to sit on the job until they "feel better" before sending the employee to the doctor even though the employee had requested to see the doctor immediately following their injury. Hollinger Cert. at ¶16.

20.   In the meantime, Mr. Serrano ordered Ms. Bull back to work.   Ms. Bull attempted to perform her job duties, but needed the assistance of her co-workers due to the heaviness of some of the packages.   Bull Dep. at 95:21 - 96:17; 98:12-16, Exh. B.

21.   Mr. Thomas never came to see Ms. Bull the day following her injury, despite the fact that he was informed by Mr. Serrano she was in pain and needed medical attention.   Id. at 96:18 - 98:16.

22.   At the end of her shift, Ms. Bull reported back to Mr. Serrano and informed him that Mr. Thomas never came to see her about her injury.   Id. at 97:9-22.

23.   In response, Mr. Serrano told Ms. Bull "there was nothing he could do about it".   Id. at 99:8 - 100:10.

24.   Ms. Bull also walked around and tried to find Mr. Thomas in order to speak to him about her injury, but could not locate him.   Id.

-9-

25.   Since Mr. Thomas never came to see Ms. Bull about her injury the day following her accident, Ms. Bull reported to work the second day following her injury. Id. at 101:7 – 102:12.

26.   Before the start of her shift, Ms. Bull went to Mr. Thomas and informed him that her arm, neck and shoulder were hurting her and that she needed to see the company doctor (the doctor that UPS sends its employees to when injured). Bull Dep. at 102:13 – 103:14, Exh. B; Bull Supp. Discrim. Charge Letter, Exh. H.

27.   Instead of attending to Ms. Bull's injury or concerns, Mr. Thomas stated to Ms. Bull, "go work over there… I will talk to you when I get everyone situated". Bull Dep. at 108:1-16, Exh. B. Ms. Bull followed the orders given to her by Mr. Thomas and again resumed her job duties at UPS. Id.

28.   Once again, Mr. Thomas ignored Ms. Bull and never returned to speak to her about her injury or to address her request to see a physician. Id. at 108:18 – 110:17.

29.   Ms. Bull attempted to get assistance from Mr. Serrano this same day. Ms. Bull advised Mr. Serrano that she was still waiting for Mr. Thomas to come see her, requested that he call Mr. Thomas and explained again that she needed to see a physician. Id.

30.   No one – not Mr. Serrano or Mr. Thomas – escorted Ms. Bull to see a physician the second day following her workplace injury. Therefore, Ms. Bull went home after her shift and returned to work the following day. Id.

31.   Due to the fact that Ms. Bull's injury and request to see a physician was being completely ignored and dismissed by her supervisors, Ms. Bull contacted her shop steward, Jim Cronin. Id. at 110:21 – 111:21. Ms. Bull informed Mr. Cronin about the fact that she needed to see a doctor and that Mr. Thomas was ignoring her. Id.

32.   Ms. Bull returned to work the third day following her workplace injury. Again, Ms. Bull told Mr. Thomas she needed to see a physician and that her arm, neck and shoulder were in excruciating pain. Again, Mr. Thomas ignored her and directed her to work and stated he would attend to her "later". Id. at 111:22 – 112:15.

-10-

33. Ms. Bull, obviously growing inpatient, went back to Mr. Thomas during her shift and emphasized to him again that she needed to see the doctor because her arm, neck and shoulder were still hurting her. Id. at 112:16 – 113:1.   In response to Ms. Bull's plea to see a doctor, Mr. Thomas commented "I don't hear you and I am ignoring you" and he walked away from her.   Id.

34. Yet again, Ms. Bull contacted her shop steward about Mr. Thomas' behavior.  Bull Dep. at 113:5-14.

35. Ms. Bull continued to report to work and perform her job duties to the best she could, requesting assistance from co-workers when necessary. Id. at 113:18-25.

36. Ms. Bull reported to work the fourth day following her workplace injury.  The same sequence of events occurred.  Ms. Bull asked to see the physician and Mr. Thomas stated he would come take care of her later.  Upon Ms. Bull revisiting the issue again later in the day, Mr. Thomas remarked, "I don't see you, I don't heart you and I'm ignoring you", and walked away from Ms. Bull. Id. at 114:1-22.

37. So, Ms. Bull reported to work the fifth day following her workplace injury.  Again, Ms. Bull was met with hostility and was dismissed by Mr. Thomas.  Ms. Bull was ignored by Mr. Thomas for approximately two (2) weeks.  Id. at Bull Dep. at 116:10-22.

38. Finally, Ms. Bull was fed up with Mr. Thomas, Mr. Serrano and the fact that no one was doing anything for her, including her shop steward.  Ms. Bull went to Mr. Thomas and stated "You do not have to worry about me asking anymore to go to the company doctor.  My attorney will be in the following day to speak to Dave Brennan, the Division Manager".  Id. at 118:11-23.

39. In a most offensive and hostile manner, Mr. Thomas replied to Ms. Bull, "your f*cking lawyer… UPS will chew your f*cking lawyer up and spit your f*cking lawyer out".  Id. at 118:24 – 119:25.

40. Ms. Bull, appalled, stated to Mr. Thomas that this was not about lawyers, it was about her getting medical attention and that she shouldn't have to "beg" for medical attention. Again, Mr. Thomas walked away from Ms. Bull.  Id.

41. Later that day, Mr. Thomas came to Ms. Bull, apologized and said she could see the UPS doctor the following day. Id. at 120:10 - 121:13.

42. Due to Mr. Thomas' hostile and disrespectful behavior, Ms. Bull insisted she meet Mr. Thomas at the doctor's office and refused to have him escort her there.   Id.

43. UPS has well-established policies and practices concerning workplace accidents and injuries.  See below, ¶¶ 43-48.

44. UPS has an "Injury/Illness Phone-In Reporting Process".  The guidelines contained in this manual state, "it is management's responsibility to assure the injured employee receives prompt and adequate medical treatment.   Injury/Illness Reporting Process, Zatuchni Cert. at Exh. K (emphasis added).

45. As outlined above, Ms. Bull did not receive prompt medical treatment.  It took UPS approximately two (2) weeks to provide Ms. Bull with the medical attention she requested and needed.  See Counter SOF above, at ¶¶ 11-41.

46. UPS also has an "Injured Employee Procedure Reference Guide", which details at length the roles and responsibilities of UPS managers/supervisors, the Human Resources Department and the Health and Safety Manager, when an employee suffers a workplace injury.   UPS Injured Employee Procedure Reference Guide at Pg. 3, Zatuchni Cert. at Exh. I.

47. This manual emphasizes that "Employee safety is a primary responsibility of all managers and supervisors".  Id.

48. It also states that the Manager to whom the injury is reported to should "evaluate and determine the extent of injury. If medical attention is required, the primary concern should be the administration of the best appropriate medical care to the injured employee".  Id. at Pg. 4.

49. Significantly, the Manager must investigate the injury and complete an Injury Investigation and Prevention Report.  Id. at Pg. 6.   As stated in the manual, "The Business Manager/Supervisor is responsible for ensuring the Injury

Prevention Report is correctly completed and root causes are identified……".   Id.

50.   Dave Thomas, the full-time Sort-Aisle Supervisor over Ms. Bull, was the "Manager" with respect to reporting and overseeing Ms. Bull's injury.   UPS Injury Investigation and Prevention Report, Zatuchni Cert. at Exh. L.

51.   Contrary to UPS' practices and policies, Mr. Thomas never investigated Ms. Bull's workplace accident, nor did he take any steps whatsoever to collect the appropriate information Ms. Bull's December 2005 workplace injury. Id. and Blanchard Dep. at 83:5 – 88:11, Zatuchni Cert. at Exh. M.

52.   Mr. Thomas neglected to provide easily obtainable and essential information pertaining to Ms. Bull's injury, such as the location of the injury, the nature of the injury, whether there were witnesses to the accident, what behavior Ms. Bull was engaged in at the time of injury, what the conditions were at the time of the injury and/or what prevention activity was appropriate or should be taken in light of her injury.   See Injury Inv. & Prev. Report, Exh. L.

53.   Michelle Blanchard, the Safety Supervisor over Ms. Bull at the time of Ms. Bull's injury, agreed that Mr. Thomas should have found out the necessary information to complete the Injury Investigation and Prevention Report and that he did not do so.   Blanchard Dep. at 88:6-11, Exh. M.

54.   In fact, Ms. Bull's workplace accident was not properly reported to UPS' workers compensation carrier, Liberty Mutual.   For instance, Ms. Bull's injury was reported as having occurred over a period of time, during the course of her normal job duties while sorting packages.   It was also incorrectly noted "[t]here was no one incident that caused the injury. Injury was due to repetitive motion".   Further, the date of her injury was listed as January 4, 2006. UPS Initial On-Line Injury Investigation Summary, Zatuchni Cert. at Exh. N.   See also Blanchard Dep. at 39:20 – 40:15; 43:15 – 49:11; 52:19 – 57:7; 60:6 – 70:9, Exh. M.

55.   Due to errors that could not be changed concerning her injury and workplace accident that occurred in December 2005, because of the manner in which her injury was reported to

Liberty Mutual, Ms. Bull could not sign off on the Investigation Summary report.  Id.

56.  In a memo from UPS employee Richard Emery, dated January 5, 2006, to Brian Bardi (Edison Pre-Load Manager for UPS), in the context of evaluating Ms. Bull's December 2005 workplace injury, UPS takes note of Ms. Bull's prior workplace accidents.  Emery Memo to Bardi, Zatuchni Cert. at Exh. U.

57.  Finally, on January 4, 2006, Ms. Bull was escorted to see a Dr. Katalin Horvath, a doctor used by UPS' workers compensation carrier, and was eventually treated for her workplace injury.  Bull Dep. at 121:14 - 128:10, Exh. B; Horvath Medical File at LB8/D00762, Zatuchni Cert. at Exh. O; Horvath Dep. at 56:3 - 58:6, Zatuchni Cert. at Exh. P.

58.  Dr. Horvath diagnosed Ms. Bull with a right shoulder contusion, cervical strain, and right trapezius contusion and strain.  Ms. Bull was placed on light duty, with no lifting above 25 pounds.  Horvath Medical File, Exh. O.

59.  Ms. Bull continued to see Dr. Horvath through January 13, 2006.  Ms. Bull had follow-up visits with Dr. Horvath on 1/9/06 and 1/13/06.  On January 13, 2006, Dr. Horvath referred Ms. Bull to an orthopedic specialist.  Id.

60.  During this time, Ms. Bull was placed on TAW (Temporary Alternative Work).  TAW is a program for employees injured on the job, who are not able to perform their regular job duties.  The Collective Bargaining Agreement does not give a set period of time or a limitation on how long the TAW period lasts for the injured employee.  However, Sal Messina, Metro Jersey Labor Relations Manager testified that typically employees get 29 days of TAW.  CBA at Article 14, Section 2, Zatuchni Cert. at Exh. R and Messina Dep. at 14:6 - 15:22, Zatuchni Cert. at Exh. Q.

61.  Ms. Bull turned her medical paperwork into her supervisor, Mr. Thomas, each time Dr. Horvath released her back to work with restrictions.  Although Ms. Bull was given some light-duty work while on TAW by working on safety surveys in the computer room, Ms. Bull was also assigned to the Smalls Department and was asked to sort packages, contrary to the weight limitation of her medical restrictions.  Bull Dep. at 139:4 - 153:20, Exh. B.

62. Ms. Bull brought this to the attention of Dr. Horvath on 1/9/06, stating in response to Dr. Horvath's question about the nature of her light duty work, "whatever they call light duty". Horvath Medical File (at D-7), Exh. O; Horvath Dep. at 21:6 – 22:13, Exh. P. See also Thomas Memo to Brian Bardi, Zatuchni Cert. at Exh. T.

63. Significantly, Mr. Thomas, in a memo written to his Manager, Brian Bardi, makes a few false statements concerning Ms. Bull's injury and status since the accident. Thomas Memo to Brian Bardi, Exh. T.

64. Mr. Thomas' memo is written in a fashion that gives the reader the impression that Ms. Bull was possibly faking her injury. Mr. Thomas states more than once that Dr. Horvath informed him that she did not believe there was anything wrong with Ms. Bull's shoulder. Id.

65. Dr. Horvath denies that she would have made this statement to Mr. Thomas, especially considering she had diagnosed Ms. Bull with a contusion. Horvath Dep. at 68:19 – 71:1, Exh. P

66. Also, in this memo, Mr. Thomas notes that Dr. Horvath informed him of Ms. Bull's comment that she was being assigned duties outside her medical restrictions. However, Mr. Thomas falsely states that the only work that Ms. Bull had been given was computer safety surveys. Thomas Memo to Brian Bardi, Exh. T.

67. The fact that Ms. Bull was sent to the Smalls Department, at least on a few occasions, while on light duty, is even confirmed by Michelle Blanchard, Safety Supervisor. Blanchard Dep. at 34:2 – 35:7, Exh. M.

68. Ms. Bull also informed the orthopedic specialist that she was referred to, Dr. Theresa Vega of Edison-Metchen Orthopaedic Group, about the fact that she was being assigned duties outside her medical restrictions. Bull Dep. at 148:3-18; 154:2-24, Exh. B. Michelle Blanchard, the Safety Supervisor, was informed about this issue as well. Id. and at 152:3-20.

69. Ms. Bull treated with the orthopedic specialist, Dr. Vega, starting on January 16, 2006 and continuing through March 29, 2006. Dr. Vega's impression was a cervical strain and

cervical radiculopathy C6/7.   During Ms. Bull's visits to Dr. Vega, Dr. Vega noticed improvement in Ms. Bull's condition, but due to some numbness/tingling sensation as a result of the degenerative disc at C6/7, she ordered Ms. Bull to remain on light duty, with no lifting over 20 pounds.   She was also ordered to continue with physical therapy.   Vega Medical File, Zatuchni Cert. at Exh. V.

70.   On February 21, 2006, Ms. Bull was placed on workers' compensation leave.   Bull Dep. at 162:2-22, Exh. B.   Ms. Bull was informed by Ms. Blanchard that unless Dr. Vega released her back to work by February 21, 2006, that she would have to take workers' compensation leave from UPS.   Id. at 162:23 – 163:21. See also Bull Charge of Discrimination, Exh. G; Supp. Discr. Charge Letter, Exh. H.

71.   On 3/10/06, an MRI of Ms. Bull's cervical spine was performed and the impression was disc bulging at C3/4, C4/5 and C5/6 with small disc herniation at C5/6.   Impressing on the anterior thecal sac at these levels was also observed and narrowing of the right neural foramen at C5/6.   MRI Findings on Ms. Bull, Zatuchni Cert. at Exh. W.

72.   By March 29, 2006, despite Dr. Vega noting 70% improvement in Ms. Bull's condition, Dr. Vega concluded that Ms. Bull had reached maximum medical improvement and that additional physical therapy was not going to make a difference.   Dr. Vega further noted, "I don't feel the patient is a surgical candidate".   Finally, Dr. Vega changed Ms. Bull's medical restrictions and placed a 10 pound overhead lifting restriction on Ms. Bull. Vega Medical File (at LB21), Exh. V.

73.   Dr. Vega gave Ms. Bull a medical note, stating, "Patient is MMI.   No Lifting more than 10 lbs overhead".   Id. (at LB22).

74.   Dr. Vega testified that "MMI" means that there is nothing else the doctor can offer the patient for their specific complaint.   It is a medical/legal phrase that is used in different situations, including those where there is nothing else the doctor can do for the patient.   Vega Dep. at 87:4 – 88:25, Zatuchni Cert. at Exh. X.

75.   Dr. Vega also clarified during her deposition in this matter that the 20 pound restriction initially placed on Ms.

Bull is a standard restriction placed on patients that come and see her.  Id. at 81:8 - 82:24.

76.  Dr. Vega also agreed that Ms. Bull had reported improvement in her condition over time, but that typically she will keep her patients on the same weight restriction regardless because pain comes and goes and patients usually go back and forth on reporting pain.  Id. at 82:25 - 85:19.

77.  Dr. Vega agreed that if Ms. Bull no longer had pain or any subjective complaints on her last visit, she would have returned Ms. Bull to her regular job duties at UPS.  Id.  85:13 - 86:21.

78.  Dr. Vega further indicated that the ten (10) pound overhead restriction placed on Ms. Bull on her last visit, did not restrict Ms. Bull from lifting from the bottom, up to her head.  The ten (10) pound restriction was only with respect to overhead lifting.  Id. at 89:1 - 91:5.  No other medical restrictions were placed on Ms. Bull by Dr. Vega.  Id.

79.  Dr. Vega made clear that it is not her decision or her job to decide whether Ms. Bull, with the ten (10) pound overhead lifting restriction, was capable of doing her job or not with UPS.  Id. at 93:18 - 96:25.

80.  Dr. Vega also made it clear that had she seen Ms. Bull after March 29, 2006, and Ms. Bull reported no pain, she would have lifted the ten (10) pounds overhead lifting restriction. This restriction was only based on Ms. Bull subjective complaint at that time that she was having pain.  Id.

81.  Dr. Vega was never asked by UPS to re-evaluate Ms. Bull after March 29, 2006.  Id.


82.  While Ms. Bull was out on workers compensation leave, the shift she was previously assigned to—the midnight shift—was eliminated.  So, when Ms. Bull returned to work on March 29, 2006, she reported to a new Manager, Ms. Liposky, on the twilight shift.  Complaint at ¶¶ 6, 14-15, 70-71, Exh. A; Blanchard Dep. at 21:7 - 23:24, Exh. M; Bull Dep. at 67:19 - 70:15; 73:17 - 75:9, Exh. B.

83.  Ms. Liposky oversaw the Small Sort operations of the Hub Department on the twilight shift.  Liposky Dep. at 14:5-16; 17:8 - 19:9, Zatuchni Cert. at Exh. Y.

84.  Hub materials are packages that are being transferred to other UPS locations versus the Pre-Load Department where the packages are being placed for immediately delivery the following morning.  Liposky Dep. at 14:5-16; 17:8 - 19:9, Exh. Y.

85.  Upon receiving the medical note from Dr. Vega stating she had reached MMI, Ms. Bull first contacted Esther or June, both of whom work in UPS' benefits office, and advised them about her last visit with Dr. Vega.  Bull Dep. at 46:3-13; 175:20 - 177:12, Exh. B. See also UPS Microsoft Access Notes, Zatuchni Cert. at Exh. Z.

86.  Ms. Bull then reported to her new supervisor, Ms. Liposky, and handed her the medical note from Dr. Vega.  Ms. Liposky read the note and then remarked to Ms. Bull that she had nowhere to put Ms. Bull.  Ms. Liposky also appeared frustrated by Ms. Bull's presence.  Bull Dep. at 177:5 - 178:24, Exh. B; Complaint at ¶ 72, Exh. A.

87.  Then, Ms. Liposky assigned Ms. Bull to the Smalls Department as a bagger.  Bull Dep. at 178:16 - 182:16, Exh. B.

88.  As a bagger, Ms. Bull would scan packages that were separated into bins, drop the packages into a bag that was below her waist, and, then, after the bag reached a certain limit/weight, would drag the bag to a conveyer belt that was below her knees.  Bull Dep. at 179:18 - 182:16, Exh. B; Liposky Dep. at 33:5 - 35:6, Exh. Y.

89.  Ms. Bull did not have to lift these packages she was handling in the Smalls Department.  Each package weighed ten (10) pounds. Bull Dep. at 179:18 - 182:16, Exh. B.

90.  Ms. Bull continued these job duties as a bagger and worked a total of five (5) days, until April 4, 2006, without any difficulty, until terminated abruptly on April 4, 2006. Id.; and 27:13 - 32:18, Exh. B.

91.  Two (2) job descriptions for the Smalls Sort position have been produced by Defendant in this matter.  The official job description for a general Smalls Sort employee, states the

employee must be able to : "Lift/lower, push/pull manipulate and carry containers weighing **up to** 70 pounds and packages weighing up to 10 pounds". Smalls Sort - General Job Description, Zatuchni Cert. at Exh. AA (emphasis added). The second job description produced by UPS, titled Smalls Sort, All Smalls Sorts, FEED (Debagging), states "continuously lift/lower, push/pull, manipulate and carry containers weighing up to 70 pounds". Smalls Sort - DeBagging Job Description, Zatuchni Cert. at Exh. BB.

92. Both job descriptions state at the bottom, "the essential functions of this job may vary greatly depending upon the size and locations of the UPS facility. At some locations, employees may not perform all of the essential job functions listed above. At other locations, employees may perform some or all of the functions listed above and, in addition, may be required to perform other jobs or tasks as directed". Id.

93. Linda Hollinger, an employee of UPS for over twenty (20) years, has worked for UPS in the Smalls Sort Department and has also worked as a Scanner. Ms. Hollinger confirms that the packages in the Smalls Department have a sort weight of 10 pounds and that overhead lifting is not necessary in order to do this job. Hollinger Cert. at ¶¶ 1-3; 19-20.

94. On April 4, 2006, Ms. Bull arrived at work, punched in and proceeded to get ready to work. At that point, Ms. Liposky approached Ms. Bull and stated "Laureen don't punch in". Ms. Bull had already done so and informed Ms. Liposky of this fact. Then, Ms. Liposky stated to Ms. Bull, "you told UPS's company doctor you didn't want to work. You have to punch out. Leave the building since you no longer work for UPS. You have a permanent medical restriction or condition"[2]. Bull Dep. at 27:13 - 32:18, Exh. B. Microsoft Access Notes produced by UPS concerning contacts made with Laureen Bull concerning her medical treatment, indicate, " Laureen now works on twilight shift (no longer preload). Janet Liposky/Erik Juenemann will have info" See UPS Microsoft Access Notes, Exh. Z. Further, there is evidence that Ms. Liposky even called Ms. Bull herself, as noted on a document produced by UPS in this matter. See Liposky Notes concerning Laureen Bull returning to the doctor on 3/29, Zatuchni Cert. at Exh. CC.

-19-

95.   As Ms. Bull did not understand why she was being told that she had told her doctor she didn't want to work, nor could she understand why she was being told she no longer worked for UPS, she contacted her union representative, Marvin Lawson. Id.; Bull Supp. Discrim. Charge Letter, Exh. H.

96.   Ms. Bull also attempted to reach out to Dr. Vega, to get clarification on what she may have told UPS about her injury.   However, Dr. Vega was on vacation and Ms. Bull was not able to speak to her.   Id.

97.   During Ms. Bull's phone conversation with Dr. Vega's secretary, however, Ms. Bull was told she did not have a permanent medical restriction and that she should tell Ms. Liposky exactly what the note states.   Bull Dep. at 379:11 – 380:23, Exh. B.

98.   Significantly, Ms. Bull also told Ms. Liposky that she was willing to get re-evaluated by Dr. Vega if necessary.   Id. at 379:11 – 380:23.

99.   Ms. Liposky testified that when she told Ms. Bull she could no longer work for UPS, Ms. Bull was upset and told Ms. Liposky that she "wanted to work".   Liposky Dep. at 43:4 – 44:11, Exh. Y.

100. Nevertheless, Ms. Bull complied with Ms. Liposky's instructions and left the premises.   Complaint at ¶ 82, Exh. A.

101. The day Ms. Liposky told Ms. Bull to leave the premises—April 4, 2006, was, in fact, Ms. Bull's last day of work at UPS.   Id. at ¶¶ 5, 74-82.

102. Defendant disputes that Ms. Bull was terminated.   See Def. SOF at ¶¶ 40-41.   However, Ms. Bull has been particularly consistent in her description of her termination/her last day of work at UPS.   By way of example, Ms. Bull relayed the very same facts concerning her termination to the orthopedist she treated with subsequent to her termination.   See Farber Medical Opinion, Zatuchni Cert. at Exh. II; Farber Dep. at 39:11-20, Zatuchni Cert. at Exh. NN.   See also Zatuchni Cert. at Exh's G and H.

103. According to Defendant, Ms. Bull was on a leave of absence of some sort due to alleged permanent medical restrictions placed on her by Dr. Vega.   See Def. SOF at ¶¶ 36

-39.    Payroll documents produced by Defendant in this matter, list Ms. Bull's status as "leave of absence". <u>See</u> UPS Job Data, Zatuchni Cert. at Exh. DD.

104. However, Ms. Bull has <u>never</u> received any written notification from UPS concerning her alleged "permanent disability restriction" or that she was being placed on a leave of absence.   Put another way, Ms. Bull has <u>never</u> received a written explanation from UPS explaining why or how Dr. Vega's medical restriction made her unable to continue working for UPS in the Small Sort Department.   Nor has she ever received any written explanation from UPS as to what <u>options</u> were available to her, assuming she did have a permanent medical restriction that prevented her from working in her position at that time. <u>See</u> Bull Supp. Discrim. Charge Letter, Exh. H.

105. Article 14, Section 3, titled, "Permanently Disabled Employees", sets forth certain procedures that must be taken by UPS when dealing with a permanently disabled employee. This section states:

> "The Parties agree to abide by the provisions of the Americans with Disabilities Act.   The Company shall be required to negotiate with the Local Union prior to providing a reasonable accommodation to a qualified bargaining employee".

> "The Company shall make a good faith effort to comply in a timely manner with requests for a reasonable accommodation because of a permanent disability…"

> "The parties agree that appropriate accommodations under this Section are to be determined on a case-by-case basis".

> "…the Employer and the Union agree to meet and discuss certain full-time positions that may be filled by employees

> who can no longer perform their assigned
> job".

CBA at Section Article 14, Section 3, Zatuchni Cert. at Exh. R.


106. Defendant UPS never had any conversations or meetings with the Union, nor did UPS ever even consider a reasonable accommodation for Ms. Bull, prior to instructing her to leave the premises on April 4, 2006 and informing her she could no longer work for UPS. According to the Collective Bargaining Agreement in place at the time of Ms. Bull's injury and at the time she released back to work by Dr. Vega, leaves of absence are permitted for ninety (90) days and may be extended for "like periods". Permission must be secured from both the Union and Employer. See Supplemental CBA at Article 60, Leave of Absence, Zatuchni Cert. at Exh. S; CBA at Article 16, Zatuchni Cert. at Exh. R.

107. In fact, in May 1996, it appears that UPS granted Ms. Bull a leave of absence due to disability. However, no such documentation or forms exist or have been produced in this matter with respect to Ms. Bull's December 2005 injury. See UPS Employee Separation Form dated 5/15/96, Zatuchni Cert. at Exh. EE.

108. Mr. Miller, a co-worker of Ms. Bull, who currently works for UPS as an unloader, testified that shortly after hearing that Ms. Bull was fired and that she was walked out of the warehouse, while talking with Part-Time Supervisor Arturo Serrano in his truck about Ms. Bull being fired, Mr. Serrano stated, "Well, you know, they were looking to get rid of her, anyway". Miller Dep. at 11:8-19; 54:17 - 55:16, Exh. J; Clay Miller Certification at ¶ 10.

109. Another co-worker of Ms. Bull, Linda Hollinger, heard a similar comment. Not long after Ms. Bull was terminated, a supervisor over Ms. Hollinger stated "all we have to do is get rid of you now". Ms. Hollinger is unsure whether Supervisor Mike DeLeon or Arturo Serrano made this statement to her. Hollinger Cert. at ¶ 13.

110. Moreover, UPS clearly treated Ms. Bull as if she was "discharged" pursuant to the explicit terms of the Collective Bargaining Agreement.   According to the Collective Bargaining Agreement effective at the time of Ms. Bull's employment with UPS, when an employee is discharged from the company, they are to be paid all money due to him/her.  CBA, Pgs. 58-59, Exh. R.

111. On May 11, 2006, Ms. Bull was issued a check by UPS in the amount of $91.56, representing payment for the sick-time owed to Ms. Bull by UPS.  See Bull Payroll History, Zatuchni Cert. at Exh. FF.

112. On June 8, 2006, Ms. Bull was issued a check by UPS in the amount of $91.56, representing holiday pay owed to Ms. Bull by UPS.  Id.

113. On June 22, 2006, Ms. Bull was issued a check by UPS in the amount of $515.03, representing payment for vacation time owed to Ms. Bull by UPS.  Bull Payroll History (LB6).

114. On July 13, 2006, Ms. Bull was issued a check by UPS in the amount of $91.56, representing additional holiday pay owed to Ms. Bull by UPS.  Id.

115. On August 17, 2006, Ms. Bull was issued a check by UPS in the amount of $542.48, representing additional vacation pay owed to Ms. Bull by UPS.  Id.

116. On September 21, 2006, Ms. Bull was issued a check by UPS in the amount of $542.48, representing additional vacation pay owed to Ms. Bull by UPS.  Id.


117. Following Ms. Bull's termination, she made numerous attempts to get her job back with UPS and continuously sought answers for UPS as to her "status".    Bull Dep. at 192:2 – 208:9, Exh. B.

118. On the day Ms. Bull was told she could no longer work for UPS, she immediately contacted Bob Cherney, at that time the Business Agent for the Teamsters, the Union to which Ms. Bull belonged while employed with UPS. Bull Dep. at 222:16 – 224:16, Exh. B; Bull 4/4/06 Handwritten Note (P094), Zatuchni Cert. at Exh. GG; Cherney Dep. at 7:24 – 8:19, Zatuchni Cert. at Exh. KK.

119. According to Ms. Bull's handwritten note from that day, she attempted to reach Mr. Cherney on two (2) occasions on April 4, 2006, but did not hear back from him. Bull Dep. at 222:16 - 224:16, Exh. B; Bull 4/4/06 Handwritten Note (P094), Exh. GG.

120. Also, on April 4, 2006, as Ms. Bull was leaving UPS with the shop steward, she bumped into a Human Resource employee (name unknown). Ms. Bull explained to this Human Resource employee that she had just been terminated. This individual wrote down on a piece of paper for Ms. Bull the telephone number for Human Resources, Ron Florczak and John Wesp, who were individuals she was told to speak to concerning her termination. Bull Dep. at 225:1 - 228:21, Exh. B; Bull Handwritten Note at P095, Exh. GG.

121. Ms. Bull believes she called all the numbers listed on the piece of paper. At the very least, Ms. Bull is certain she called and spoke to John Wesp, on April 6, 2006. Id.

122. When Ms. Bull finally spoke to Mr. Wesp, he informed Ms. Bull that she was on permanent disability and could not work for UPS, but could go work somewhere else. He further told Ms. Bull that she was not entitled to any further benefits from UPS. Bull Supp. Discrim. Charge Letter, Exh. H; Bull Dep. at 47:9 - 7; 203:3 - 205:6; 227:23 - 228:21, Exh. B.

123. On April 7, 2006, Ms. Bull again attempted to contact Bob Cherney at about 2:15 p.m.. Mr. Cherney was not in to take Ms. Bull's phone call. Bull Dep. at 236:13 - 238:17, Exh. B and Bull handwritten notes at P096, Exh. GG.

124. A review of this note also appears to indicate that Ms. Bull called Mr. Cherney yet again on April 8, 2006 at 11:34, but he was not in on this date either. Bull Handwritten Notes at P096, Exh. GG.

125. By May 3, 2006, Ms. Bull still did not have any answers and she continued to call Mr. Cherney in an attempt to address her "status' with UPS. Mr. Cherney was not available to speak to Ms. Bull on this day either. Bull Handwritten Notes at P097, Exh. GG and Bull Dep. at 358:13 - 359:20, Exh. B.

126. On either May 4th or 5th, 2006, Mr. Cherney finally returned Ms. Bull's phone calls about her employment with UPS.

Bull Handwritten Notes at P098, Exh. GG and Bull Dep. at 360:3 – 363:2, Exh. B.

127. Ms. Bull had a lot of difficulty getting answers from Mr. Cherney with respect to how to handle Dr. Vega's medical restrictions and what she needed to do to return to work at UPS. For instance, at one point Mr. Cherney told Ms. Bull that the union doesn't handle "comp" (meaning workers' compensation) cases. Also, Ms. Bull had a lot of trouble getting a hold of Mr. Cherney at the union hall. Bull Dep. at 277:14 – 279:7, Exh. B.

128. Regardless, Ms. Bull remained patient and once she received instructions from Mr. Cherney to get a second opinion from another doctor, Ms. Bull made an appointment with Dr. Morton Farber of Union County Orthopaedic Group, in Linden, New Jersey, for June 13, 2006. Dr. Farber was recommended to Ms. Bull by her family physician. Farber Intake Papers, Zatuchni Cert. at Exh. HH; Bull Dep. at 191:7 – 193:23, Exh. B.

129. On June 13, 2006, Dr. Farber conducted a full physical exam on Ms. Bull and reviewed MRI films. His conclusion was "I think the patient is capable of working for UPS and could lift 50 pounds. I would limit her to the 50 pounds because the fact remains she was hired with that amount in mind. I think a limitation of 10 pounds is arbitrary. The patient has great upper extremity strength, normal reflexes, excellent grip….It is my overall impression that she can work for UPS in her position as either a small sorter or sorter". Farber Medical Opinion, Zatuchni Cert. at Exh. II; Farber Dep. at 34:7 – 35:25, Exh. NN.

130. When Ms. Bull was hired, the weight restriction for part-time employees working on the night shift was fifty (50) pounds. Later on during Ms. Bull's employment, this restriction was increased to seventy (70) pounds. Cherney Dep. at 29:1 – 31:14, Exh. KK; Bull Dep. at 199:3-22, Exh. B.

131. Dr. Farber also gave Ms. Bull a medical note, which indicated, "patient is capable of lifting 50 pounds or more". Farber 6/13/06 Medical Note, Zatuchni Cert. at Exh. JJ.

132. Dr. Farber testified that one of his secretaries wrote out this doctor's note, but he reviewed it and signed it. Farber Dep. at 18:16 – 19:12.

133. Ms. Bull faxed Dr. Farber's June 13, 2006 note to the union hall. Bull Dep. at 193:24 - 195:23, Exh. B.

134. Ms. Bull also called Esther, at UPS' benefit office, and discussed with her the fact that she had obtained a note from her own doctor allowing her to come to work. Esther told Ms. Bull "I don't think they're letting you come back". When Ms. Bull asked why, Esther stated "because your doctor isn't familiar with your job". Bull Dep. at 205:7 - 207:17, Exh. B.

135. On June 14, 2006, the day after her examination with Dr. Farber, Ms. Bull attempted to reach Mr. Cherney at the Union Hall, but Mr. Cherney was on another call. Ms. Bull spoke with a secretary/receptionist person named Jessica and left a message. Bull Handwritten Notes at P099, Exh. GG and Bull Dep. at 363:6 - 364:13, Exh. B.

136. Ms. Bull called Mr. Cherney again on June 21, 2006. Ms. Bull was advised that Mr. Cherney was on vacation and would be back on Monday (June 26, 2006). Bull Handwritten Notes at P101, Exh. GG; Bull Dep. at 367:23 - 369:14, Exh. B.

137. At some point after returning from vacation, Mr. Cherney contacted Ms. Bull to speak to her about Dr. Farber's June 13, 2006 medical note. On this date, Ms. Bull was advised by Mr. Cherney that she would have to obtain a note from Dr. Farber stating that she could lift seventy (70) pounds. Bull Dep. at 199:3 - 200:11; 207:18 - 208:1; 279:12 - 280:16, Exh. B; Bull Handwritten Notes at P103/LB56, Exh. GG.

138. On July 25, 2006, Ms. Bull spoke with Mr. Cherney a second time about getting another medical note from Dr. Farber and informed him that she did not have the money to see Dr. Farber again. Bull Handwritten Notes at P103/LB56, Exh. GG.

139. On or about July 29, 2006, UPS requested that Dr. Farber complete an "Essential Job Function Work Status Sheet" with respect to Ms. Bull, to clarify what Ms. Bull's restrictions were at that time. See UPS File on Dr. Farber, Zatuchni Cert. at Exh. MM; Farber Dep. at 20:14 - 22:16, Exh. NN.

140. At the top of this form, above the entry titled "Job Description", it lists Ms. Bull's position as Loader/Unloader. Id. (at D00725). This part of the form was filled out by UPS

Nurse, Kathy Deady.   Id.   This is incorrect, as the last time Ms. Bull worked for UPS, she was working as a Smalls Sort bagger.  Bull Dep. at 178:16 – 182:16, Exh. B.

141. In fact, Ms. Deady faxed this form over to Dr. Farber's office with a List of Essential Job Functions for a "Loader/Unloader". Id. (at D00725 to 729). The job description for a "Loader/Unloader" is different than the job descriptions for "Smalls Sort".  Compare Zatuchni Cert. at Exh. OO with Exh's AA and BB.  Specifically, the Loader/Unloader job description contains an additional requirement that the employee assist in moving packages up to 150 pounds.  Id.

142. Dr. Farber completed or signed the "Essential Job Function Work Status Sheet" form on August 1, 2006.  See UPS File on Dr. Farber (at D722), Zatuchni Cert. at Exh. MM.  Farber Dep. at 62:19 – 63:21, Exh. NN; Messina 9/27/06 Correspondence, Zatuchni Cert. at Exh. TT.   This form lists Ms. Bull's medical restrictions as 50 pounds. See UPS File on Dr. Farber (at D722), Zatuchni Cert. at Exh. MM

143. Ms. Bull spoke to Mr. Cherney again on August 3, 2006, about the fact that UPS was insisting that Ms. Bull get a second doctor's note from Dr. Farber that allowed her lift seventy (70) pounds.  During this conversation, Ms. Bull also discussed with Mr. Cherney the third-party doctor evaluation section of the collective bargaining agreement that applied to Ms. Bull.  Bull Handwritten Notes at P104 & 105/LB 57/58, Zatuchni Cert. at Exh. BB; Bull Dep. at 382:19 – 385:18, Exh. B.

144. By this point, Ms. Bull had grown agitated and felt she was being given the run-around.  Bull Dep. at 384:22 – 385:18, Exh. B.  Nevertheless, as requested, Ms. Bull contacted Dr. Farber's office, explained that in order to return to her job at UPS, she needed to be cleared to lift seventy (70) pounds.  Bull Dep. at 199:3 – 200:11, Exh. B.

145. Ms. Bull then went to Dr. Farber's office and picked up a second medical note.  **This note stated "patient is not able to lift over 70 lbs"**.  Id. and Dr. Farber 8/14/2006 Medical Note, Zatuchni Cert. at Exh. PP.

146. Although Dr. Farber later testified that he did not sign this note, he **confirmed** at his deposition that the August 14, 2006 medical note given to Ms. Bull in this matter **was**

-27-

**written by his office and came from his office**.   Farber Dep. at 43:10 - 46:13; 57:16-18, Exh. NN.   Dr. Farber testified that the note was possibly written by one of the other physicians working out of his office and that it is common for other doctors in his office review a chart, sign something, renew medication, renew physical therapy, etc…. for patients of Dr. Farber. . Id. at 54:16 - 57:4.

147. Furthermore, a fax from an employee of Dr. Farber's office, Denise Daniels, confirms in an email to UPS Regional Nurse Kathy Deady, dated September 18, 2006, that both the June 13th and  August 14th notes were from Dr. Farber's office, although Ms. Bull was only physically examined by Dr. Farber on June 13th.   See UPS File on Dr. Farber (at D00723), Zatuchni Cert. at Exh. MM

148. When questioned about the September 18, 2006 email from Denise of Dr. Farber's office, confirming both medical notes came from his office, Dr. Farber testified as follows:

"Q.   The note she's referencing there, the August 14, 2006 note, is also

attached, and that corresponds to MF-11, correct?

A.   Correct.

Q.   Actually, this is dated September 18, 2006, and now if you take a look at

what's been marked MF-12, this is an email back. Why don't you take a

look at it.

A.   Yes.

Q.   This is an email from Denise Daniels, and it is an email from Union   County Orthopedic, correct?

A.   Yes.

Q.   You testified you did have somebody here named Denise, correct?

A.   Yes.

-28-

Q.    So it seems there was somebody named Denise here.
      Looks like it was

      Denise   Daniels   who   was   communicating   with
Kathleen Deady at UPS,   right?

A.    Yes.

Q.    What's the date on this email?

A.    September 18.

Q.    It appears that Ms. Daniels did respond from your
      office to Kathleen   Deady, correct?

A.    Yes.

Q.    And this is her response?

A.    Yes.

Q.    "Dear Kathleen:   The notes attached are from my
      office," , correct?

A.    Yes.

Q.    So she's confirming that both notes actually were
      generated by your     office?

A.    Yes.

Farber Dep. at 44:20 - 46:2, Exh. NN.[3]

149. Regardless, Ms. Bull faxed Dr. Farber's August 14,
2006 note to the union hall.  Bull Dep. at 201:12 - 202:21, Exh.
B.

150. Dr. Farber's medical file did <u>not</u> contain the June 14th
medical note, which, in fact, Dr. Farber admittedly <u>signed</u>/
Farber Dep. at 42:8-24, Exh. NN.

151. Meanwhile, Ms. Bull contacted Dr. Farber's office,
asking for him to recommend the names of three (3) doctors, one

-29-

of whom would possibly be selected as a "third party doctor" to evaluate Ms. Bull in the event UPS continued to dispute Ms. Bull's ability to return to work. See Bull Handwritten Note to Farber, Zatuchni Cert. at Exh. QQ and Bull Handwritten Notes at P116/LB66, Exh. GG.

152. Dr. Farber did provide the names of three (3) doctors and this information was provided to UPS. Ms. Bull faxed this information over to Mr. Cherney on or about August 14, 2006. See Dr. Farber Third Party Doctor List, Zatuchni Cert. at Exh. RR; Bull Dep. at 386:1 - 388:3, Exh. B; Bull Handwritten Notes at P108/LB59, Exh. GG; Farber Dep. at 10:1-12, Exh. NN.

153. As of September 13, 2006, Ms. Bull still did not have answers from Mr. Cherney as to whether she could go back to work at UPS. Bull Handwritten Notes at P110/LB61, P112/LB62, P113/LB63, P114/LB64, Exh. GG. Bull Dep. at 395:20 - 400:6, Exh. B.

154. At some point, Mr. Cherney called Ms. Bull about the fact that Dr. Farber had a form he was suppose to complete and was taking a long time to return it to UPS. Id.

155. It seems as though after UPS received Dr. Farber's August 14, 2006 medical note with the seventy (70) pound lifting restriction, Kathy Deady, the Regional Nurse for UPS, re-faxed the Essential Job Function Work Status Sheet form to Dr. Farber a second time on September 7, 2006. See UPS File on Dr. Farber Communic., Exh. MM (at D00725 to 729).

156. On September 18, 2006, Ms. Deady contacted Dr. Farber's office and again asked for him to please complete the worksheet. In this letter, with respect to the August 14, 2006 note, Ms. Deady writes, "Can you confirm that she [Ms. Bull] was not seen by the doctor after June 6, 2006 and this not was not written by your office". Id. at (D00731).

157. On the same day, late in the afternoon, Denise of Dr. Farber's office, sent an email to Ms. Deady, confirming that both notes produced to UPS concerning Ms. Bull were from Dr. Farber's office:   The email states:   "The notes attached are from my office. The patient receive them in August but was not seen. She ask if doctor would put her limitations. Once again, she was only seen in my office one time". Id. (at D00723).

158. It also seems as though on September 20, 2006, Denise of Dr. Farber's office re-faxed the August 1, 2006 Essential Job Function Work Status Sheet, completed by Dr. Farber, to Ms. Deady.  UPS file on Dr. Farber (at D00721-722), Exh. MM.

159. No one from UPS ever contacted or spoke to Dr. Farber about Ms. Bull medical restrictions.  Farber Dep. at 68:20 - 69:23, Exh. NN; Messina Dep. at 36:14 - 37:15, Exh. Q.

160. In the midst of Ms. Bull's numerous conversations with Mr. Cherney, Dr. Farber's office and a few other UPS employees (including Ester Lundy), Ms. Bull also contacted the EEOC about what happened to her at UPS.  Bull Handwritten Notes at P100, Exh. GG and Bull Dep. at 364:17 - 366:7, Exh. B.

161. Ms. Bull's EEOC Charge of Discrimination details her injury, how she was treated by UPS following her injury, her termination and states that Ms. Bull felt she was being discriminated against based on her age, disability and that she was experiencing retaliation.  Bull Charge of Discrim, Exh. G.

162. On or about September 8, 2006, Mr. Cherney filed a grievance on Ms. Bull's behalf, requesting that Ms. Bull be made whole and noting that UPS was refusing to have Ms. Bull evaluated by a third-party doctor, which was in violation of the Collective Bargaining Agreement.  Bull Grievance, Exh. SS.

163. The Collective Bargaining Agreement, Article 20, states in Section 2:

"It is understood by the Employer and the Union that once an employee

notifies the Employer that he/she has been released to return to work by

the employee's doctor, the Company doctor must examine the employee

within three (3) working days from the time the employee brings the

return-to-work slip to the Employer".

See Zatuchni Cert. at R.

164. In Section 3 of Article 20, it further states:

> "The Employer reserves the right to select its own medical examiner or doctor and the Union may, *if it believes an injustice has been done an employee*, have said employee re-examined at the employee's expense. If the two (2) doctors disagree, the Employer and the Union shall mutually agree upon a third (3r$^d$) doctor within ten (10) working days, whose decision shall be final and binding on the Employer, the Union and the employee."

See Zatuchni Cert. at Exh. R (emphasis added).

165. Despite these provisions in the Collective Bargaining Agreement and the grievance filed by Mr. Cherney on Ms. Bull's behalf, Sal Messina, Metro District Labor Manager for UPS, refused to allow Ms. Bull to be either re-evaluated by Dr. Vega (or another company doctor) or by a third-party physician selected by the Union and UPS. UPS 9/27/06 Letter to Cherney, Zatuchni Cert. at Exh. TT; Messina Dep. at 5:17 – 6:1, Exh. Q.

166. Essentially, UPS claims it oncluded that because there were issues surrounding Dr. Farber's medical notes and paperwork, Ms. Bull was not entitled to a third-party physician evaluation. Therefore, UPS simply re-confirmed its prior decision that Ms. Bull could no longer work for UPS, despite the fact she made several attempts to dispute her medical restrictions and expressed a strong desire to return to work for UPS. Id.; Messina Dep. at 41:11 – 43:21.

167. Mr. Messina testified that he did not believe there was a "dispute" between Dr. Vega's note and Dr. Farber's notes, in order to trigger the third-party physician evaluation. Messina Dep. at 42:3 – 43:21, Exh. Q.

168. According to Mr. Messina, even though there were numerous inconsistencies in Dr. Farber's records and questions about whether his signature was authentic on all documents from

his office, Mr. Messina chose to accept as authentic the document sent to UPS by Dr. Farber's office that placed Ms. Bull on a fifty (50) pound lifting restriction.   Id. at 25:16 - 36:20; 43:22 - 46:22; 68:22 - 71:18.   In order words, even though there were inconsistencies and Dr. Farber's signature was questionable on all documents from his office, including those that limited Ms. Bull to lifting over 50 pounds, the only document dismissed by UPS was Dr. Farber's August 14, 2006 note— the very note that would have allowed Ms. Bull to return to work at UPS full duty.   Id.   Compare Farber 6/13/06 Note, Exh. JJ with Farber 8/14/06 Note, Exh. PP;  UPS File on Dr. Farber, Exh. MM.

169. Mr. Cherney, testified that he never even saw the Essential Job Function Report, restricting Ms. Bull to fifty (50) pounds, which UPS claims it received it September and upon which UPS relies in concluding that Ms. Bull had not been released to work full-duty as of September 2006 and; therefore, was not entitled to a third-party medical evaluation.   Id. at 59:4 - 61:9, Exh. KK.

170. In fact, Mr. Cherney himself, did not feel that there was an issue or ambiguity with the August 14, 2006 doctor's note turned in by Ms. Bull.   Cherney Dep. at 54:1 - 56:1, Exh. KK. Mr. Cherney felt that both Dr. Farber disability notes turned in by Ms. Bull were legible and clear.   Id. at 78:25 - 89:3.

171. Mr. Cherney confirms that the August 14, 2008 note supplied by Ms. Bull, which stated, "Patient not able to lift over 70 pounds", would allow Ms. Bull to work for UPS as a Smalls Sort Debagger and would comply with UPS' Essential Job Duties description for that job.   Cherney Dep. at 90:2 - 92:15 and 97:21 - 101:25, Exh. KK; Smalls Sort Job Descriptions, Exh. AA and BB; Farber 8/14/06 Note, Exh. PP.

172. Nevertheless, based on UPS' decision that Ms. Bull had not been released back to full-duty by her doctor, Mr. Cherney wrote to Ms. Bull on September 21, 2006, advised her that UPS had taken the position she has not been returned to work full duty and; therefore, UPS was refusing to have her examined by a company doctor.   Cherney 9/21/06 Letter, Zatuchni Cert. at Exh. UU.

166. From Ms. Bull's perspective, Ms. Bull had complied with all of UPS' requests and she had done everything possible

-33-

to get her job back.   Ms. Bull went and saw a physician and obtained a note allowing her lift 50 pounds or more, which she thought cleared her to work in the Small Sort.   When that wasn't good enough, she went back to Dr. Farber and requested clarification on her medical restrictions and obtained a second note, allowing her to lift up to 70 pounds.   Then, Ms. Bull requested to be evaluated by a third-party physician and had information faxed over to UPS concerning the 3 orthopedic physicians that could serve as the third-party physician.   By September 2006, five (5) months after she was told she could no longer work for UPS, it became clear to Ms. Bull that UPS was just simply not going to take her back.   Bull Dep. at 272:7-18, Exh. B.

### B.   **Defendant:**

1.   Whether the essential functions of Ms. Bull's job include lifting and/or otherwise manipulating weights up to 70 pounds.   (Plaintiff's Counter-Statement of Facts, ¶¶ 86-90).

2.   Whether the essential functions of Ms. Bull's job also entail assisting in lifting and/or otherwise manipulating weights up to 150 pounds.   (Plaintiff's Counter-Statement of Facts, ¶ 89).

3.   Whether on the day of Ms. Bull was injured in December 2005,   Mr. Thomas spoke with Ms. Bull about her injury within 30 minutes of her injury.   (Bull dep. 86:5-88:6).

4.   Whether on the date of her injury, full-time Supervisor Dave Thomas asked Ms. Bull if she wanted to go to the hospital and whether Ms. Bull declined, and indicated that she wanted to see how she felt later in the day.   (Bull dep., 92:14-93:2).

5.   Whether Bull then advised Mr. Thomas that she wanted to go home, and UPS permitted her to leave work.   (Bull dep., 93:3-12).

6.   Whether Ms. Bull asked management at UPS to see a doctor between the day after her injury in late December 2005 and January 3, 2006.   (Bull dep., 94:12-95:12; 98:12-16; 97:9-22; 101:7-102:12, 102:13-103:14; 108:18-110:17; 110:21-114:22; 116:10-122).

-34-

*[handwritten margin note:]* NO later than January 15, 2010 the defendant shall submit a replacement to pages 34-42 that sets forth the facts defendant intends to prove for which there has been no stipulation

7.   Whether Mr. Thomas or any other UPS supervisor or manager acted inappropriately to Ms. Bull following her December 2005 injury.  (Bull dep., 118:24-119:25).

8.   Whether Ms. Bull threatened Mr. Thomas about calling her lawyer.  (Bull dep., 118:24-121:13).

9.   Whether after Dr. Horvath placed medical restrictions on Ms. Bull, Ms. Bull was placed on a temporary alternate work program "TAW" pursuant to a provision in the collective bargaining agreement.  (Bull dep., 143:8-12; 317:22-25; 315:1-8).

10. Whether Ms. Bull agreed with the restrictions placed on her by Dr. Horvath. (Bull dep., 140:11-15).

11. Whether Dr. Vega initially determined that Ms. Bull was not capable of lifting over 20 pounds.

12. Whether and how numerous provisions in the collective bargaining agreements are relevant to the claims in this case include, including but not limited to:

*See Page 34*

- "Temporary Alternative Work ("TAW")," Article 14 of the National Master Agreement.
- "Over 70 Pound Service Package Handling," Article 44 of the National Master Agreement.
- "Return to Work Examination," Article 20, Section 2 of the National Master Agreement.
- "Third Doctor Procedure," Article 20, Section 3 of the National Master Agreement.
- "Discharge," Article 47 of the Supplemental Agreement.
- "Leave of Absence," Article 60, Section 3 of the Supplemental Agreement.
- "Medical Arrangements," Article 52 of the Supplemental Agreement.
- "National Grievance Procedure," Article 8 of the National Master Agreement.
- "Grievance and Arbitration," Article 44 of the Supplemental Agreement.
- "Separation of Employment," Article 23, National Master Agreement

- "Leaves of Absence," Article 60, Supplemental Agreement.

(Ganley Cert., Ex. 1 & 2).

13. Whether Ms. Bull had workplace injuries at UPS between her hire date and 1995, and she received workers' compensation benefits and time off from work for some of those injuries. (Certification of Michelle Blanchard., Ex. 1-10; Bull dep., 104:3-19; 287:10-15; 299:15-301:1).

14. Whether after each injury which occurred between Ms. Bull's hire date and 1995, Ms. Bull returned to work after being cleared to return to work by a doctor. (Bull dep., 282:9-13).

15. Whether UPS ever terminated Ms. Bull's employment under the discharge provisions of the collective bargaining agreement between UPS and the Teamsters Union. (Plaintiff's Counter-Statement of Facts, ¶107).

See Pag 34

16. Whether UPS complied with the temporary alternative work "TAW" provisions of the collective bargaining agreement between UPS and the Teamsters union. (Plaintiff's Counter-Statement of Material Facts, ¶ 59-60; 66-67).

17. Whether UPS terminated Ms. Bull's employment because she sought certain workers' compensation benefits. (See Generally UPS' Trial Brief).

18. Whether Ms. Bull gave Janet Liposky a copy of Dr. Vega's March 29th note. (Bull dep., 46:3-13; 175:20-177:12).

19. Whether, after a few days of working between March 29, 2006, and April 4, 2006, Ms. Bull told Ms. Liposki that she would not work as directed because she had medical restrictions. (Liposky dep. 35:10-36:16 ).

20. Whether on April 4, 2006, Ms. Liposky told Ms. Bull that she could not continue to work her due to her medical restrictions. (Bull dep., 273-32:18).

21. Whether Ms. Liposky explained to Ms. Bull on April 4, 2006, why she could not continue to work, and the content of that discussion. (Plaintiff's Counter-Statement of Facts, ¶¶ 92-97).

-36-

22. Whether UPS terminated Ms. Bull's employment at all on April 4, 2006.   (Plaintiff's Counter-Statement of Material Facts, ¶¶ 92, 100).

23. Whether last day that Ms. Bull reported to work at UPS was April 4, 2006.

24. Whether certain union representatives discussed with Ms. Bull on April 4, 2006, the need for her to get clarification of her medical restrictions.   (Bull dep., 32:19-33:15).

25. Whether Ms. Bull was told that she no longer had medical benefits as of April 4, 2006.   (Bull dep., 47:9-17; 203:3:3-205:6; 227:23-228:21).

26. Whether John Wesp told Ms. Bull in 2006 that she "...could no longer work for UPS."   (Bull dep., 47:9-17; 203:3:3-205:6; 227:23-228:21).

27. Whether Esther Lundy told Ms. Bull that UPS was "not letting her come back to work."   (Bull dep., 205:7-207:17).

28. Whether on April 4, 2006, Ms. Bull contacted Bob Cherney, Business Agent for Teamsters Local 177.   (Bull dep., 62:12-19).

29. Whether Ms. Bull told her union that her employment with UPS was terminated.   (Bull dep., 43:3-8 ).

30. Whether Ms. Bull asked her union to file a grievance on her behalf claiming that she had been discharged from UPS.  (Bull dep., 42:20-43:).

31. Whether Ms. Bull remains a UPS employee on a leave of absence.   (See generally UPS' trial brief).

32. Whether Ms. Bull's leave of absence has been properly extended under the terms of the collective bargaining agreement. (Plaintiff's Counter-Statement of Material Facts, ¶¶ 101; 105).

33. Whether Ms. Bull received medical benefits from UPS through at least the end of 2007, and was asked to elect benefits for the 2008 plan year.   (UPS Trial Exhibit 131).

34. Whether Article 14, Section 3 of the collective bargaining agreement, titled "Permanently Disabled Employees," applies to Ms. Bull. (Plaintiff's Counter Statement of Material Facts, ¶ 103).

35. Whether Ms. Bull acted in good faith in her interactions with UPS. (See generally UPS' trial brief).

36. Whether Ms. Bull's union and Ms. Bull had difficulty or delay in communicating with each other from April 4, 2006 through the current date. (Plaintiff's Counter-Statement of Material Facts ¶¶; 120-125).

37. Whether on June 14, 2006, Dr. Farber found Ms. Bull capable of lifting more than 50 pounds. (Plaintiff's Response to UPS' Statement of Material Facts, ¶ 50).

38. Whether Dr. Farber has ever found Ms. Bull capable of lifting more than 50 pounds. (Plaintiff's Counter-Statement of Material Facts, ¶ 127, Plaintiff's Response to UPS' Statement of Facts ¶ 50).

*See page 34*

39. Whether on June 14, 2006, Ms. Bull had an examination by Dr. Morton Farber. (Bissinger Cert., Ex. 34).

40. Whether Ms. Bull provided a copy of Dr. Farber's June 14, 2006 medical note to the Teamsters union, and UPS received a faxed copy of that note. (Bull dep. 193:24-195:23).

41. Whether Sal Messina, UPS Director of Labor Relations for the Metro New Jersey District, communicated with Mr. Cherney about Ms. Bull. (Messina dep., 32:10-14; Ex. 8, Cherney dep., 26:20-27:6; 29:1-8; 31:6-19; Bull dep., 62:12-19;).

42. Whether any medical professional ever authorized anyone to change Ms. Bull's medical restrictions on or about August 14, 2006.

43. Whether the August 14, 2006 note, which purports to be from Dr. Farber, is a legitimate medical note or a sham note. (Plaintiff's Counter-Statement of Material Facts, ¶ 141 and UPS' trial brief).

-38-

44. Whether Ms. Bull produced a valid, reliable medical note to UPS in August 2006. (Plaintiff's Counter-Statement of Material Facts, ¶¶ 141-142).

45. Whether on August 14, 2006, Ms. Bull sent the union a second doctor's note written on Dr. Farber's stationary. (Cherney dep., 33:13-19; 34:10-11).

46. Whether any doctor conducted a physical evaluation of Ms. Bull in connection with this second note. (Farber dep., 25:2-25 & 26:1-6; Bull dep., 197:13-198:4).

47. Whether Dr. Farber did not sign the August 14, 2006, note and he did not authorize anyone else to sign his name to that note. (Farber dep., 25:2-25; 27:6-8).

48. Whether UPS received a faxed version of the August 14, 2006 note.

49. Whether any medical professional has ever found Ms. Bull capable of lifting up to 70 pounds and or performing the essential functions of her job at UPS since April 4, 2006. (See generally UPS' Trial Brief).

50. Whether there are ambiguities, unclear statements, and contradictions in the alleged August 14th medical note. (Cherney dep., 54:1-56:1).

51. Whether Mr. Messina attempted, through Ms. Bull's union and physician, to find out if Ms. Bull was medically cleared to return to work at UPS.

52. Whether Ms. Bull was qualified for a third party medical evaluation under the terms of the collective bargaining agreement. (Plaintiff's Counter-Statement of Facts, ¶¶ 159-162).

53. Whether Kathy Deady, UPS Occupational Health and Safety Nurse, sent Dr. Farber's office the position description for Ms. Bull's job. (Plaintiff's Counter-Statement of Facts, ¶ 136).

54. Whether Dr. Farber's office faxed to UPS information relating to Ms. Bull's medical restrictions in the

-39-

EJFWSS.   (Bissinger Cert., Ex. 7, Messina dep., 38:4-14; Ex. 37).

55. Whether Mr. Messina communicated with Mr. Cherney about the August 14th note and the EJFWSS.  (Messina dep., 41:4-6).

56. When certain documents were faxed between UPS and Dr. Farber's office. (Plaintiff's Counter-Statement of Material Facts, ¶ 152).

57. Whether the last document that UPS received from Dr. Farber stated that Ms. Bull could lift up to 50 pounds. (Plaintiff's Counter-Statement of Material Facts, ¶ 152).

58. Whether Ms. Bull was entitled to receive a third party medical evaluation under the terms of the collective bargaining agreement and/or whether UPS complied with that contract and provisions.  (Plaintiff's Counter-Statement of Facts, ¶¶ 159- 162).

59. Whether Ms. Bull has made reasonable attempts to return to work at UPS since April 2004 to mitigate her damages. (See generally UPS' trial brief).

60. Whether Ms. Bull has been able to perform the essential functions of her job at any time between April 4, 2006, and the current date.  (See generally UPS' trial brief).

61. Whether allowing Ms. Bull to perform her job at UPS from April 4, 2006 through the current date would have caused a potential safety danger to Ms. Bull and/or other UPS employees.  (See generally UPS' trial brief).

62. Whether other than providing Local 177 with a note dated 6/14/06, and a note dated 8/14/06 for which she was never examined, Ms. Bull made any attempts ascertain her medical restrictions and/or to return to work at UPS.  (See generally UPS' trial brief).

63. Whether Ms. Bull made numerous attempts to "get her job back" and continuously sought answers from UPS as to her "status."   (Bull dep., 192:2-208:9, Plaintiff's Counter-Statement of Material Facts, ¶ 114).

64. Whether Ms. Bull had alleged communications with UPS employees John Wesp and Esther Lundy concerning her injury and medical status. (Plaintiff's Counter-Statement of Material Facts, ¶¶ 119; 129).

65. Whether UPS denied a grievance filed by Ms. Bull through her union concerning a third party medical evaluation procedure set forth in the collective bargaining agreement. (Messina dep., 42:3-43:21).

66. Whether Mr. Cherney sent a letter to Ms. Bull dated September 21, 2006. (Bissinger Cert., Ex. 38).

67. Whether Mr. Messina sent Mr. Cherney a letter dated September 27, 2006. (Bissinger Cert., Ex. 39).

See page 34

68. Whether Mr. Cherney sent Ms. Bull a letter dated October 13, 2006. (Cherney dep., 66:20-25 & 67:1; Ex. 40).

69. Whether Mr. Cherney sent Ms. Bull a letter dated November 3, 2006. (Cherney dep., 68:8-12; Ex. 41).

70. Whether on May 22, 2006, Ms. Bull filed a Workers' Compensation Claim Petition against UPS.

71. Whether Dr. Arthur Tiger, an expert retained by Ms. Bull's counsel in Ms. Bull's workers' compensation case, issued a letter dated November 29, 2006, concerning his medical findings after his examination of Ms. Bull.

72. Whether Ms. Bull stopped communicating with UPS and her union after September 2006. (See generally UPS' trial brief).

73. Whether the collective bargaining agreement requires that Ms. Bull be able to lift 70 pounds in her job at UPS. (See Plaintiff's Counter-Statement of Material Facts, ¶¶ 89-90).

74. Whether Ms. Bull's medical benefits at UPS were ever terminated and, if so, when. (Bull dep., 47:9-17; 203:3:3-205:6; 227:23-228:21; UPS Trial Exhibit 131).

75. Whether UPS continued to issue compensation to Ms. Bull after April 4, 2006 due to the terms and conditions of the collective bargaining agreement between UPS and Ms. Bull. (Plaintiff's Counter-Statement of Facts, ¶ 107).

76. Whether Ms. Bull made reasonable efforts to mitigate her alleged economic damages by looking for other comparable jobs since April 4, 2006. (See generally, UPS' *in limine* motion on damages).

See page 34

77. Whether Ms. Bull has proven any emotional distress damages due to the alleged conduct of UPS. (See generally, UPS *in limine* motions).

78. Whether UPS complied with other relevant provisions of the collective bargaining agreements.

5. **WITNESSES** (Aside from those called for impeachment purposes, only the witnesses set forth may testify at trial. No summary of testimony is necessary.)

A.   **Plaintiff**:

Laureen Bull
Linda Hollinger
David Thomas
Clay Miller
Michelle Blanchard
Dr. Katalin Horvath
Sal Messina
Brian Bardi
Dr. Theresa Vega
Janet Liposky
Dr. Morton Farber
Robert Cherney
John Wesp

B.   **Defendant**:

- Brian Bardi
- Michelle Blanchard
- June Caporale
- Robert Cherney

-42-

- Bryan Clark
- James "Jim" Cronin
- Kathy Deady
- Brian Doherty
- Dr. Morton Farber
- Sandra "Sandy" Fisher
- John Ganley
- Glen Henry
- Dr. Katalin Horvath
- Marvin Lawson
- Janet Liposky
- Esther Lundy
- Sal Messina
- Kirk Olsen
- Robert Romero
- Arturo Serrano
- Dave Taurone
- Dave Thomas
- Dr. Arthur Tiger
- Dr. Teresa Vega
- William "John" Wesp
- Based upon the Court's determination following an in camera review of Ms. Bull's OB-GYN records, any OB-GYN physicians who evaluated or provided treatment to Ms. Bull.

*resolved by order dated November 25, 2009*

-43-

6. **NOTE:** **LAY OPINIONS** (Counsel's attention is directed to the case of Teen-Ed, Inc. v. Kimball Intern, Inc., 620 F.2d 399 (3rd Cir. 1990) and Asplaundh Mfg. Div. Benton Harbor Engineering, 57 F.3d 1190 (3" Cir. 1995). Admissions of opinion testimony under Federal Rule 701 of a kind discussed in the Teen-Ed, Inc. and Asplaundh Mfg. Div. are required to be identified in this Pre-Trial Order. No lay witness whose testimony is in the form of an opinion qualifying under Federal Rule of Evidence 701 and of the nature described in those cases will be permitted to testify at trial unless listed below with a summary of the proposed opinion attached hereto.)

A. **Plaintiff:**

The following medical providers may be asked to provide opinion testimony regarding Plaintiff's medical condition and status as observed relating to the witnesses medical treatment and/or evaluation of Plaintiffs:

- Dr. Morton Farber
- Dr. Theresa Vega
- Dr. Katalin Horvath

B. **Defendant:**
- Dr. Morton Farber
- Dr. Theresa Vega
- Dr. Katalin Horvath
- Dr. Arthur Tiger
- Based upon the Court's determination following an in camera review of Ms. Bull's OB-GYN records, any OB-GYN physicians who evaluated or provided treatment to Ms. Bull.

-44-

7. **EXPERT WITNESSES** (No expert shall be permitted to testify at trial unless identified below and unless a summary of his qualifications* and a copy of his report is attached hereto. The summary shall be read into the record at the time he takes the stand, and opposing counsel shall not be permitted to question his expert qualifications unless the basis or objection is set forth herein.)

    A.   **Plaintiff**: None.

    B.   **Defendant**: None.

---

* If the parties stipulate to an expert's qualifications, there is no need to attach a summary.

8. **DEPOSITIONS** (List, by page and line, all deposition testimony
         to be offered into evidence. All irrelevant and
         redundant matters and all colloquy between counsel
         must be eliminated. Deposition testimony to be used
         solely for impeachment purposes need not be listed.)

   A.   **Plaintiff:**

Laureen Bull

      Bull Dep. at 47:9 - 7; 203:3 - 205:6; 227:23 - 228:21
      Bull Dep. at 11:23 - 12:19
      Bull Dep. at 20:10 - 21:16
      Bull Dep. at 23:5-21; 27:13 - 31:13
      Bull Dep. at 27:13 - 32:18
      Bull Dep. at 46:3-13; 175:20 - 177
      Bull Dep. at 63: 2-20
      Bull Dep. at 64:3 - 67:3
      Bull Dep. at 67:19 - 70:15; 73:17 - 75:9
      Bull Dep. at 68:15-24
      Bull Dep. at 73:9-23
      Bull Dep. at 73:9-23
      Bull Dep. at 83:2-23.
      Bull Dep. at 83:2 - 84:16
      Bull Dep. at 84:17 - 86:25
      Bull Dep. at 87:24 - 90:23
      Bull Dep. at 91:1 - 92:20
      Bull Dep. at 92:15 - 93:2
      Bull Dep. at 94:12 - 95:12; 98:12-16
      Bull Dep. at 95:21 - 96:17
      Bull Dep. at 96:18 - 98:16
      Bull Dep. at 97:9-22.
      Bull Dep. at 99:8 - 100:10.
      Bull Dep. at 101:7 - 102:12.
      Bull Dep. at 102:13 - 103:14
      Bull Dep. at 108:1-16
      Bull Dep. at 108:18 - 110:17.
      Bull Dep. at 110:21 - 111:21
      Bull Dep. at 111:22 - 112:15.
      Bull Dep. at 112:16 - 113:1
      Bull Dep. at 113:18-25
      Bull Dep. at 113:5-14

```
Bull Dep. at 114:1-22.
Bull Dep. at 116:10-22.
Bull Dep. at 118:11-23.
Bull Dep at 118:11 - 119:25; 120:10 - 121:13
Bull Dep. at 118:24 - 119:25.
Bull Dep. at 121:14 - 128:10
Bull Dep. at 139:4 - 153:20
Bull Dep. at 148:3-18; 154:2-24
Bull Dep. at 152:3-20.
Bull Dep. at 162:2-22
Bull Dep. at 162:23 - 163:21
Bull Dep. at 177:5 - 178:24
Bull Dep. at 178:16 - 182:16
Bull Dep. at 179:18 - 182:16
Bull Dep. at 191:7 - 193:23,
Bull Dep. at 192:2 - 208:9
Bull Dep. at 193:24 - 195:23
Bull Dep. at 199:3-22
Bull Dep. at 199:3 - 200:11; 207:18 - 208:1; 279:12 -
280:16
Bull Dep. at 201:12 - 202:21
Bull Dep. at 205:7 - 207:17.
Bull Dep. at 222:16 - 224:16
Bull Dep. at 225:1 - 228:21
Bull Dep. at 236:13 - 238:17
Bull Dep. at 272:7-18
Bull Dep. at 277:14 - 279:7,
Bull Dep. at 358:13 - 359:20,
Bull Dep. at 360:3 - 363:2
Bull Dep. at 363:6 - 364:13
Bull Dep. at 364:17 - 366:7
Bull Dep. at 367:23 - 369:14
Bull Dep. at 379:11 - 380:23
Bull Dep. at 382:19 - 385:18
Bull Dep. at 384:22 - 385:18
Bull Dep. at 386:1 - 388:3
Bull Dep. at 395:20 - 400:6
```

David Thomas

```
Thomas Dep. at 15:10 - 17:10
Thomas Dep. at 32:1 - 33:15
```

-47-

Clay Miller

    Miller Dep. at 11:8-19; 54:17 - 55:16
    Miller Dep. at 31:13 - 32:8; 50:4 - 51:25


Michelle Blanchard

    Blanchard Dep. at 21:7 - 23:24
    Blanchard Dep. at 34:2 - 35:7
    Blanchard Dep. at 39:20 - 40:15; 43:15 - 49:11; 52:19 -
57:7; 60:6 - 70:9
    Blanchard Dep. at 83:5 - 88:11
    Blanchard Dep. at 88:6-11


Dr. Katalin Horvath

    Horvath Dep. at 21:6 - 22:13
    Horvath Dep. at 56:3 - 58:6
    Horvath Dep. at 68:19 - 71:1


Sal Messina

    Messina Dep. at 5:17 - 6:1
    Messina Dep. at 14:6 - 15:22
    Messina Dep. at 25:16 - 36:20; 43:22 - 46:22; 68:22 -
71:18
    Messina Dep. at 26:12-14
    Messina Dep. at 36:14 - 37:15
    Messina Dep. at 38:24 - 40:25; 52:17 - 55:19; 71:19 -
74:18
    Messina Dep. at 41:11 - 43:21.
    Messina Dep. at 42:3 - 43:21.


Dr. Theresa Vega

    Vega Dep. at 81:8 - 82:24.
    Vega Dep. at 82:25 - 85:19.
    Vega Dep. at 85:13 - 86:21.

Vega Dep. at 87:4 – 88:25
Vega Dep. at 93:18 – 96:25.

Janet Liposky

Liposky Dep. at 14:5-16; 17:8 – 19
Liposky Dep. at 33:5 – 35:6
Liposky Dep. at 43:4 – 44:11

Dr. Morton Farber

Farber Dep. at 10:1-12
Farber Dep. at 20:14 – 22:16
Farber Dep. at 34:7 – 35:25
Farber Dep. at 39:11-20
Farber Dep. at 43:10 – 46:13; 57:16-18
Farber Dep. at 44:20 – 46:2
Farber Dep. at 54:16 – 57:4[4]
Farber Dep. at 57:5-18
Farber Dep. at 62:19 – 63:21
Farber Dep. at 68:20 – 69:23

Robert Cherney

Cherney Dep. at 7:24 – 8:
Cherney Dep. at 29:1 – 31:14
Cherney Dep. at 54:1 – 56:1
Cherney Dep. at 78:25 – 89:3.
Cherney Dep. at 90:2 – 92:15 and 97:21 – 101:25
Cherney Dep. at 102:19 – 107:23.

B.    **Defendant:**

**Laureen Bull**

14:1-20:9

———————————————

```
23:5-25

238:3-239:9

235:17-236:12

253:3-256:7

352:7-15

352:16-358:5

427:8-21
```

**Robert Cherney**

```
51:1-3

65:22-66:8

75:22-76:1
```

**Dr. Morton Farber**

```
23:23-26:6

30:11-31:5

33:17-34:1

44:4-6

61:9-62:14

66:21-67:18

62:19-63:21
```

**Dr. Katlin Horvath**

```
18:9-8
```

-50-

```
28:10-29:21
32:23-35:24
59:24-61:14
```

**Arturo Serrano**

```
5:17-6:5
14:3-6
19:23-20:5
```

**Dr. Teresa Vega**

```
38:5-40:1
86:22-90:8
```

9. **EXHIBITS** (Except for exhibits the need for which could not reasonably have been foreseen or which are used solely for impeachment purposes, only the exhibits set forth on the exhibit list attached hereto may be introduced at trial. All parties hereby agree that, unless set forth herein, objections to authenticity are deemed waived.)

    A.    **Plaintiff**:    SEE ATTACHED EXHIBIT LIST.

| NO. | Description | ID. | EV. |
|---|---|---|---|
| 1 | Ms. Bull's Employee History Profile | D 1-3 | |
| 2 | Ms. Bull's Answers to Interrogatories | | |
| 3 | Perfect Attendance Awards received by Laureen Bull from UPS | P 11 | |
| 4 | Ms. Bull's Charge of Discrimination, dated November 13, 2006 | P 69 | |
| 5 | Ms. Bull's Supplemental Statement in support of her Charge of Discrimination | P 30-32 | |
| 6 | UPS' Injured Employee Procedure Reference Guide | D 576-603 | |
| 7 | UPS' Injury/Illness Phone-In Reporting Process | D 605-606 | |
| 8 | UPS' Injury Investigation and Prevention Report on Laureen Bull | D 399-405 | |
| 9 | UPS' Initial On-Line Injury Investigation Summary on Laureen Bull's December 2005 workplace injury | D 396-398 | |
| 10 | Medical file of Dr. Katalin Horvath | Dep. Exh. D 1-16 | |
| 11 | Collective Bargaining Agreement – National Master UPS Agreement | D 642-720 | |

*[Handwritten note beside rows 4-5: "Defendant preserves authenticity objection"]*

| 12 | Teamster Local 177 Collective Bargaining Supplemental Agreement | D 607-641 | |
| 13 | David Thomas' memo to Brian Bardi concerning his conversation with Dr. Horvath | D 564 | Defendant Preserves authenticity objection |
| 14 | Richard Emery January 5, 2006 Memo to Brian Bardi concerning Laureen Bull prior injuries | D 751 | |
| 15 | Dr. Theresa Vega's Medical File | LB Dep. Exh. 11-22 | |
| 16 | MRI results for Laureen Bull, dated 3/10/06 | D 455 | |
| 17 | UPS Microsoft Access Notes concerning Laureen Bull | D 421 | |
| 18 | UPS job description for Smalls Sort (General) | D 575 | |
| 19 | UPS job description for Smalls Sort (FEED Debagging) | D 574 | |
| 20 | Janet Liposky Notes concerning Laureen Bull returning to the doctor on 3/29 | D 1384 | Defendant preserves authenticity objection |
| 21 | UPS Job Data on Laureen Bull | D 1373-1381 | |
| 22 | UPS Employee Separation Document, dated 5/5/96 | D 1196 | |
| 23 | Laureen Bull Payroll History | D 27-42 | |
| 24 | various handwritten notes by Laureen Bull | P 94-118 | Defendant preserves authenticity objection |
| 25 | Dr. Morton Farber's Intake documents on Laureen Bull | MF Exh. 2 | |
| 26 | Morton Farber's Medical Opinion Letter | MF Exh. 6 | |
| 27 | Dr. Morton Farber's June 14, 2006 Medical Note | P 46 | Defendant preserves authenticity objection |
| 28 | UPS file regarding communications with Dr. Morton Farber's office | D 721-733 | |

| 29 | UPS job description for Loader/Unloader | D 573 | |
| 30 | Dr. Morton Farber's August 14, 2006 medical note | P 45 | |
| 31 | Laureen Bull's Handwritten Note to Dr. Farber concerning third-party doctor review | | |
| 32 | Dr. Farber's list of three candidates for third-party doctor review of Laureen Bull | D 420 | |
| 33 | Laureen Bull's Grievance, No. 26291, against UPS regarding third-party doctor review | D 411 | |
| 34 | UPS September 27, 2006 correspondence to Robert Cherney concerning Laureen Bull | D 409 | |
| 35 | Robert Cherney's September 21, 2006 correspondence to Laureen Bull | P 20 | |
| 36 | Any and all documents identified by Defendant in this Pre-Trial Order not otherwise objected to | | |

*[Handwritten note on right margin:]* Defendant preserves it authenticity objection — Discovery objection resolved plaintiff shall provide copy by 12/24/09 and the defendant preserves its authenticity objection

**Defendant:**

| Exhibit No. | Description | Bates No. (if applicable) | Id. (Init.) | Ev. |
|---|---|---|---|---|
| 1. | 6/14/06 Dr. Morton Farber's medical note (faxed version) | D-733 | | |
| 2. | 6/13/06 "Visit summary" from Dr. Farber's office | P-120 | | |
| 3. | 7/29/06 Fax from Kathy Deady to Dr. Farber seeking review of EJF for Loader/Unloader position | D-725-729 | | |
| 4. | 8/15/06 Fax from Robert Cherney to Sandy Fisher, enclosing faxed version of 8/14/06 Dr. Farber Medical Note | D-417-418 | | |
| 5. | 9/7/06 Fax Cover Sheet from Kathy Deady to Dr. Farber seeking review of EJF for Loader/Unloader position | D-724 | | |
| 6. | 9/8/06 Fax Cover Sheet from Robert Cherney to Sal Messina and Sandy Fisher | D-413 | | |
| 7. | 9/18/06 Fax from Kathy Deady to Denise at Dr. Farber's office | D-730-733 | | |
| 8. | 9/18/06 E-mail from Denise Daniels to Kathy Deady | D-723 | | |
| 9. | 9/18/096 Fax from Sandy Fisher to Robert Cherney | D-410-412 | | |
| 10. | 9/20/06 Fax from "Denise" to Kathy Deady | D-2423-2424 | | |
| 11. | 8/21/06 Fax from Sandy Fisher to Robert Cherney | D-422-423 | | |
| 12. | 9/21/06 Letter from Robert Cherney to Laureen Bull | P-20 | | |
| 13. | 9/27/06 Letter from Sal Messina to Robert Cherney | D-407-409 | | |
| 14. | 10/13/06 Letter from Robert Cherney to Laureen Bull | P-21 | | |
| 15. | 11/3/06 Letter from Robert Cherney to Laureen Bull | P-22 | | |
| 16. | 12/06 Post-It Note T/W Bob | D-2395 | | |

| Exhibit No. | Description | Bates No. (if applicable) | Id. (Init.) | Ev. |
|---|---|---|---|---|
| 17. | 5/30/07 Letter from Laureen Bull to Robert Cherney | P-23-25 | | |
| 18. | 6/13/07 Letter from Robert Cherney to Laureen Bull | P-26-27 | | |
| 19. | 1/4/06 Dr. Katalin Horvath Medical Report | P-48 | | |
| 20. | 1/9/06 Dr. Katalin Horvath Examination Notes | D-759 | | |
| 21. | 1/9/06 Dr. Katalin Horvath Medical Report | D-760 | | |
| 22. | 1/13/06 Dr. Katalin Horvath Medical Report | D-758 | | |
| 23. | 1/16/06 Dr. Teresa Vega Medical Note | P-55 | | |
| 24. | 1/16/06 Dr. Teresa Vega Medical Examination Notes | D-772-774 | | |
| 25. | 1/30/06 Dr. Teresa Vega Medical Note | P-62 | | |
| 26. | 1/30/06 Dr. Teresa Vega Medical Examination Notes | D-775-777 | | |
| 27. | 2/15/06 Dr. Teresa Vega Medical Note | P-52 | | |
| 28. | 3/15/06 Dr. Teresa Vega Medical Note | P-54 | | |
| 29. | 3/1/06 Dr. Teresa Vega Medical Records | D-778-780 | | |
| 30. | 3/15/06 Dr. Teresa Vega Medical Records | D-781-783 | | |
| 31. | 3/15/06 Dr. Teresa Vega Medical Note | P-51 | | |
| 32. | 3/29/06 Dr. Teresa Vega Medical Note (with redaction of material on the top of the document which was not part of the medical note) | P-50 | | |
| 33. | 3/29/06 Dr. Teresa Vega Medical Notes from examination | D-438-440 | | |
| 34. | 1/15/06 "History of Accident" Report signed by Laureen Bull | D-1389 | | |

| Exhibit No. | Description | Bates No. (if applicable) | Id. (Init.) | Ev. |
|---|---|---|---|---|
| 35. | 1/19/06 Edison Preload Safety Committee Meeting Notes | D-1051-1058 | | |
| 36. | 1/5-6/06 Safe Work Habits Training Records for Laureen Bull | D-734-735 | | |
| 37. | 2/15/-2/17/06 Computer Training Records for Laureen Bull | D-1285 | | |
| 38. | 1/6/06 Safe Work Habits Training Records | D-1280-1282 | | |
| 39. | Training Assessment History for Laureen Bull | D-1060-1069 | | |
| 40. | 1/5/06 Habits Training Record for Laureen Bull | D-1283 | | |
| 41. | 3/7/06 Liberty Mutual Check for $640.92, check no. 63371316 | D-1388 | | |
| 42. | 3/7/06 Liberty Mutual Statement for check no. 63371316 | P-41 | | |
| 43. | 3/10/06 Liberty Mutual Check for $320.46, check no. 63373685 | D-1387 | | |
| 44. | 3/10/06 Liberty Mutual Statement for check no. 63373685 | P-42 | | |
| 45. | 3/24/06 Liberty Mutual Check for $320.46, check no. 63382157 | D-1385 | | |
| 46. | 3/17/06 Liberty Mutual Check for #320.46, check no. 63378063 | D-1386 | | |
| 47. | Summary of Laureen Bull's workers' compensation wage benefits for 2/22/06 - 3/29/06 | D-797 | | |
| 48. | UPS Job Description for Loader/Unloader | D-573 | | |
| 49. | UPS Job Description for "All Smalls Sorts" "Feed Debagging" | D-574 | | |
| 50. | UPS Job Description - Small Sorts | D-575 | | |
| 51. | 4/24/08 Gems report on Laureen Bull | D-1273 | | |
| 52. | (6/06) 20 year Certificate of Recognition | P-43 | | |
| 53. | "Congratulations" letter for 20 year service/gift offer | P-160-161 | | |

| Exhibit No. | Description | Bates No. (if applicable) | Id. (Init.) | Ev. |
|---|---|---|---|---|
| 54. | UPS Computerized Job Data Information for Laureen Bull | D-1372-1381 | | |
| 55. | UPS Computer Records for Laureen Bull | D-11-21 | | |
| 56. | Laureen Bull's UPS Employee History Profile | D-1-3 | | |
| 57. | (W/E: 3/4/06 – 8/12/06) UPS Employee Staffing Records for the Twilight Sort | D-1007-1050 | | |
| 58. | 2005 UPS Payroll Processing Payroll History Report for Laureen Bull | D-42-59 | | |
| 59. | 2006 UPS Payroll Processing Payroll History Report for Laureen Bull | D-27-41 | | |
| 60. | Payroll record concerning Laureen Bull | D-1358 | | |
| 61. | UPS Earnings Statement for pay period ending 2/4/06, check no. 0727204563 | P-38 | | |
| 62. | UPS Earnings Statement for period ending 4/1/06, check no. 0727232004 | P-35 | | |
| 63. | UPS check to Laureen Bull dated 4/6/06 for $154.20, check no. 0727232004 | D-1371 | | |
| 64. | UPS Earnings Statement for pay period ending 4/8/06, check no. 0727234883 | P-33 | | |
| 65. | UPS check to Laureen Bull dated 4/13/06 for $29.80, check no. 727234883 | D-1370 | | |
| 66. | UPS Earnings Statement for pay period ending 5/6/06, check no. 0727249031 | P-39 | | |
| 67. | UPS check to Laureen Bull dated 5/11/06 for $59.91, check no. 0727249031 | D-1369 | | |
| 68. | UPS Earnings Statement for period ending 6/3/06, check no. 0727258539 | P-36 | | |
| 69. | UPS check to Laureen Bull dated 6/8/06 for $26.36, check no. 727258539 | D-1368 | | |

| Exhibit No. | Description | Bates No. (if applicable) | Id. (Init.) | Ev. |
|---|---|---|---|---|
| 70. | UPS check to Laureen Bull dated 6/22/06 for $322.33, check no. 727264359 | D-1367 | | |
| 71. | UPS Earnings Statement for pay period ending 7/1/06, | P-34 | | |
| 72. | UPS Earnings Statement for the period ending 7/8/06, check no. 0727272736 | P-144 | | |
| 73. | UPS check to Laureen Bull dated 7/13/06 for $26.36, check no. 727272736 | D-1366 | | |
| 74. | UPS check to Laureen Bull dated 8/17/06 for $342.89, check no. 727286609 | D-1364 | | |
| 75. | UPS check to Laureen Bull dated 8/17/06 for $342.91, check no. 727286608 | D-1365 | | |
| 76. | UPS check to Laureen Bull dated 7/7/07 for $342.90, no. 11865211 | D-1361-1363 | | |
| 77. | UPS Earnings Statement for the period ending 8/26/06 | P-145 | | |
| 78. | UPS Earnings Statement for the period ending 9/2/06, check no. 727286609 | P-146 | | |
| 79. | UPS Earnings Statement for the period ending 1/6/07, check no. 727353759 | P-147 | | |
| 80. | UPS check to Laureen Bull dated 1/13/07 for $63.67, check no. 727353759 | D-1360 | | |
| 81. | UPS Earnings Statement for the period ending 5/5/07 for $289.32, check no. 0727395069 | P-2 | | |
| 82. | UPS check to Laureen Bull dated 5/10/07 for $89.87, check no. 727395069 | D-1359 | | |
| 83. | Pay stub dated 6/7/07, no. 322091 | P-37 | | |
| 84. | UPS check to Laureen Bull dated 6/7/07 ($342.90) | P-154 | | |

| Exhibit No. | Description | Bates No. (if applicable) | Id. (Init.) | Ev. |
|---|---|---|---|---|
| 85. | Classified ads and other job advertisements produced in discovery by UPS | D-895-1006; D-2425-2449 | | *π preserv authentic objection |
| 86. | Mitigation documentation produced by Laureen Bull | P-121-123; P-124-127; P-132; P-163-164 | | |
| 87. | UPS Code of Business Conduct | D-259-280 | | |
| 88. | UPS/Teamsters Local 177 Collective Bargaining Agreement (2002-2008) | D-607-641 | | |
| 89. | National Master UPS Collective Bargaining Agreement with the International Brotherhood of Teamsters (2002-2008) | D-642-720 | | |
| 90. | Redacted UPS Employee History Profile Report of Janet Liposky | D-738-744 | | |
| 91. | Redacted UPS Employee History Profile Report of Dave Thomas | D-745-751 | | |
| 92. | Redacted UPS Employee History Profile Report of Michelle Blanchard | D-752-756 | | |
| 93. | (11/96) Employee Injury Prevention Report signed by Laureen Bull | D-1070-1072 | | |
| 94. | (6/95) Employee Injury Prevention Report signed by Laureen Bull | D-1073-1074 | | |
| 95. | (8/94) Employee Injury/Illness Report signed by Laureen Bull | D-1075-1076 | | |
| 96. | 8/29/94 Note from Dr. Mark Shottenfeld regarding light duty for Laureen Bull | D-1115 | | |
| 97. | 8/16/94 Note from Hadley Medical Center and note from Dr. Mark Shottenfeld regarding light duty for Laureen Bull | D-1120 | | |
| 98. | (9/93) Employee Injury Illness Report signed by Laureen Bull | D-1080-1081 | | |
| 99. | 10/19/93 - Hadley Medical Center Medical Note | D-1118 | | |

| Exhibit No. | Description | Bates No. (if applicable) | Id. (Init.) | Ev. |
|---|---|---|---|---|
| 100. | 3/15/93 - Note from Newark Beth Israel Medical Center finding Laureen Bull medically capable of returning to work on 3/17/93 | D-1116 | | |
| 101. | (4/1992) Employee Injury Illness Report signed by Laureen Bull | D-1083-1085 | | |
| 102. | 4/27/92 - Hadley Medical Center light duty note for Laureen Bull | D-1117 | | |
| 103. | 4/22/92 Hadley Medical Center medical note for Laureen Bull | D-1119 | | |
| 104. | (3/1991) Employee Injury/Illness Report signed by Laureen Bull | D-1087-1089 | | |
| 105. | (10/90) Employee Injury/Illness Report | D-1090-1093 | | |
| 106. | (1990) Employee Injury/Illness Report signed by Laureen Bull | D-1094-1098 | | |
| 107. | (4/88) Employee Accident Prevention Report signed by Laureen Bull | D-1099 | | |
| 108. | (4/15/88) Employee Accident Report signed by Laureen Bull | D-1100 | | |
| 109. | (11/1987) Employee Accident Report signed by Laureen Bull | D-1101-1102; D-1110; D-110A; and D-1111 | | |
| 110. | (11/1987) Employee Accident Report signed by Laureen Bull | D-1112-1114 | | |
| 111. | 2006 Worker's Compensation Employee Claim Petition | D-561-562 | | |
| 112. | 2006 Worker's Compensation Employee Claim Petition | D-1395 | | |
| 113. | 6/12/06 - UPS' Answer to Claim Petition, Claim No. 2006-14511 | D-2686-2687 | | |
| 114. | Certification in Lieu of Affidavit of Authentication of Business Records for Freeman, Barton, Huber & Sacks, P.C. signed by Deborah C. Brennan on September 1, 2009 | D-2450 - 2451 | | |

| Exhibit No. | Description | Bates No. (if applicable) | Id. (Init.) | Ev. |
|---|---|---|---|---|
| 115. | 11/29/06 Medical Examination Report of Dr. Arthur Tiger, M.D. (and Certification of Records) | D-541-542; D-1756-1757 | | |
| 116. | 2003 Worker's Compensation Employee Claim Petition | D-1480 | | |
| 117. | Worker's Compensation Order Approving Settlement with Dismissal | D-1556 | | |
| 118. | 1993 Worker's Compensation Employee Claim Petition | D-1571-1572 | | |
| 119. | 3/26/1996 Worker's Compensation Order Approving Settlement With Dismissal | D-1573 | | |
| 120. | (5/03-6/03) Medical Records of Healthsouth concerning May 2003 Worker's Compensation injury | D-1344-1357 | | |
| 121. | (1978) Worker's Compensation Order for Judgment | D-1559 | | |
| 122. | 1991 Employee Attendance record for Laureen Bull | D-1244-1245 | | |
| 123. | 1994 Employee Attendance record for Laureen Bull | D-1223-1224 | | |
| 124. | 1993 Employee Attendance record for Laureen Bull | D-1260-1261 | | |
| 125. | UPS' First Request for Production of Documents Directed to plaintiff Laureen Bull | | | |
| 126. | Plaintiff's Responses to Defendant's Demand for Documents | | | |
| 127. | UPS' Initial Interrogatories Directed to plaintiff Laureen Bull | | | |
| 128. | Plaintiff's Answers to Defendant's Interrogatories | | | |
| 129. | Laureen Bull's miscellaneous handwritten notes | P-93-105; P-108-118 | | |
| 130. | Wal-Mart 2008 Associate Benefits Book (and Certification of Records) | D-2097-2348; D-2095 | | |

| Exhibit No. | Description | Bates No. (if applicable) | Id. (Init.) | Ev. |
|---|---|---|---|---|
| 131. | 11/7/07 UPS letter to Laureen Bull re: Enrollment Guide for Health Plan for Part-time Employees (with attachments) | P-167-322 | | |

10. **SINGLE LIST OF LEGAL ISSUES** (All issues shall be set forth below. The parties need not agree on any issue. Any issue not listed shall be deemed waived.)

1.  Whether UPS terminated plaintiff's employment on April 4, 2006, due to her disability.

2.  Whether UPS terminated plaintiff's employment on April 4, 2006, because she sought workers' compensation benefits.

3.  Whether plaintiff has proven that she was medically qualified to perform the essential functions of her job at UPS as of April 4, 2006.

4.  Whether certain evidence and/or damages should be stricken pursuant to the *in limine* motions of UPS and plaintiff.

6.  Whether defendant has proven by a preponderance of the evidence that Ms. Bull did not make reasonable efforts to mitigate her alleged economic damages.

7.  Whether plaintiff has proven by a preponderance of the evidence any emotional distress damages.

8.  Whether the evidence of the case warrants punitive damages, and whether plaintiff has proven that she is entitled to punitive damages by clear and convincing evidence.

9.  Whether the trial of punitive damages should be bifurcated from the trial on liability.

10. Whether plaintiff's claims are preempted by federal labor law.

11. Any additional legal issues set forth in the parties' trial briefs and *in limine* motions. — as set forth in Section 2 at p. 3

12. Whether Plaintiff has proven by a preponderance of the evidence that Defendant failed in its obligation to reasonably accommodate Plaintiff's medical disability.

13. Whether Plaintiff has proven by a preponderance of the evidence that Defendant failed to engaged in an interactive

process in determining a reasonable accommodation for Plaintiff's medical disability.

11. **MISCELLANEOUS** (Set forth any matters which require action or should be brought to the attention of the Court.)

1. Defendant's request to have plaintiff produce certain medical records that defendant argues are relevant to her emotional distress claims, and which the court reserved its decision on until after the disposition of defendant's summary judgment motion. (see letter to the court dated 4/17/08). *Resolved by order dated November 25, 2009*

2. Witness availability:

   (a) Confirm whether any *de bene esse* depositions of the medical professionals are necessary once a trial date has been set.

   *De Bene Esse* depositions may be necessary for the following medical professionals *and witness Robert Cherney*

   - Dr. Morton Farber

   - Dr. Theresa Vega

   - Dr. Katalin Horvath

   - Dr. Arthur Tiger

   - Based upon the Court's determination following an in camera review of Ms. Bull's OB-GYN records, any OB-GYN physicians who evaluated or provided treatment to Ms. Bull. *Resolved by order dated November 25, 2009*
     - *Robert Cherney*

   *The parties do not oppose use of this approach if a witness cannot appear at trial*

   (b) Confirm any fact witness availability issues after a trial date has been set. *— The parties have confirmed witness availability. Defendant shall advise plaintiff's counsel if subpoenas must be served upon current VPS employees and union employees. Plaintiff shall serve subpoenas upon the former employees. Defendant shall provide last known addresses for these employees if needed.*

-66-

12. **TRIAL COUNSEL** (List the names of trial counsel for all parties.)

- David Zatuchni, Esq., Zatuchni & Associates, Counsel for Plaintiff

- Michael T. Bissinger, Esq., Day Pitney LLP, lead trial Counsel for Defendant

- Rachel A. Gonzalez, Esq., Day Pitney LLP

13. **JURY TRIALS**

    Forty-eight (48) hours prior to the final pretrial conference or as directed by the Magistrate Judge Mark Falk

A.    Each party shall submit to the Court and to opposing counsel a trial brief in accordance with L. Civ. R. 7.2(b) (SEE ATTACHED "RIDER ON LENGTH OF BRIEFS") with citations to authorities cited and arguments in support of its position on all disputed issues of law. **THE BRIEF SHALL ALSO ADDRESS ANY ANTICIPATED EVIDENCE DISPUTE. FAILURE TO BRIEF ANY ISSUE, INCLUDING AN EVIDENTIARY ISSUE WHICH SHOULD HAVE BEEN ANTICIPATED, WILL BE DEEMED TO BE A WAIVER OF SUCH ISSUE.** In the event a brief is not submitted timely, the delinquent party's pleading may be stricken, or other sanctions imposed.

    Trial Briefs have been submitted. (*In limine* motions will be submitted on the deadlines set by the court at the pre-trial conference.)

*Any revised trial brief shall be submitted no later than January 15, 2010*

B.    Each party shall submit to the Court and to opposing counsel any hypothetical questions to be put to an expert witness on direct examination.

    None.

14. **JURY INSTRUCTIONS VOIR DIRE, NEUTRAL STATEMENT OF THE CASE AND VERDICT SHEET.** *Courtesy copies shall be provided to the District Judge no later than December 23, 2009*

The parties are to confer and prepare agreed-upon jury instructions, voir dire questions, verdict sheet and a neutral statement of the case (limited to two (2) typewritten pages) to be read to the jury panel, all of which must be submitted at the final pretrial conference, or as ordered by the Magistrate Judge Mark Falk. Jury instructions are to be submitted in the following format:

*The parties shall advise the district judge of the areas in the jury instructions and verdict sheet for which they could not reach agreement*

A.   The parties shall obtain from the Magistrate Judge Mark Falk a copy of the Court's "Standard General Jury Instructions" These are standard instructions that have been used without objection in prior trials.

These instructions do not address the substantive elements of any causes of action. These instructions are to be incorporated in the proposed instructions, wherever possible. If a party has any objections to any of these proposed instructions they shall immediately advise their adversary and the Court.

In preparing the jury instructions, the parties shall:

(i)   Use common words, not legalese, whenever possible.
(ii)  Use simple sentences; avoid subordinate clauses.
(iii) Avoid double negatives.
(iv)  Use the active voice.
(v)   Avoid abstract instructions; tailor instructions to case.
(vi)  Avoid unnecessary instructions.

B.   The parties shall also confer and agree upon a verdict sheet and shall follow the above designated procedure for arriving at jointly agreed upon instructions where applicable.

C.   The Court also has "Standard Preliminary Instructions" which the Court reads to the jury before the commencement of the trial. Counsel shall also obtain a copy of these preliminary instructions and shall

-69-

immediately advise counsel and the Court prior to the trial if there is any objection to the preliminary instructions.

D. Counsel shall also confer and agree upon a neutral statement summarizing the case that the Court can use in orienting the panel as to the kind of case this is. This shall be limited to two (2) typewritten pages.

E. The parties are required to jointly submit one set of agreed upon instructions incorporating the standard instructions.

It is not enough for the parties to merely agree upon the standard general instructions, and then each submit their own set of substantive instructions. The parties are expected to meet, confer and agree upon the substantive instructions for the case.

To accomplish this the parties are required to serve their proposed instructions upon each other prior to the final pretrial conference. The parties then are required to meet or confer and submit to the Court one complete set of agreed upon instructions.

F. The parties are required to submit the proposed joint set of instructions and proposed supplemental instructions in the following format:

(i) There must be two sets of each instruction;

(ii) The first copy should indicate the number of the proposed instruction, and the authority supporting the instruction; and

(iii)    The second copy should contain only the proposed instruction – there should be no other marks or writings on the second copy except for a heading reading "Instruction #___" with the number left blank.

(iv) The parties shall also submit to the Deputy Clerk where possible a 3.5" disc in Word Perfect

(preferably 5.1)   containing the second copy
referenced in paragraph (iii).

G.   All   instructions   should   be   short,   concise,
understandable   and   <u>neutral</u>   statements   of   law.
Argumentative   or   formula   instructions   are   improper,
and will not be given and should not be submitted.

H.   Parties   should   also   note   that   any   modifications   of
instructions   from   statutory   authority,   or   Devitt,
Blackmar   &   O'Malley   (or   any   other   form   instructions)
must   specifically   state   the   modification   made   to   the
original   form   instruction   and   the   authority   supporting
the modification.

I.   The   parties   are   directed   to   obtain   from   Judge
Cavanaugh's   Deputy   Clerk,   Michael   DeCapua,   the   Court's
proposed   and   preferred   voir   dire   questions.   If   there
is   any   objection   to   the   proposed   voir   dire   questions,
counsel   should   immediately   advise   the   Court   and   its
adversary in writing.

J.   If   either   party   feels   that   additional   voir   dire
questions   should   be   submitted,   the   parties   are
required   to   jointly   submit   a   set   of   agreed   upon   voir
dire   questions.   Accordingly,   the   parties   are   required
to   serve   their   proposed   voir   dire   upon   each   other
three   weeks   prior   to   trial   and   shall   follow   the   above
designated   procedure   for   arriving   at   jointly   agreed
upon instructions where applicable.

The   foregoing   must   be   submitted   **forty-eight (48) hours
before** the   final   pretrial   conference,   or   as   directed   by   the
Magistrate Judge Mark Falk.

Failure   to   comply   with   any   of   the   above   instructions   may
subject   the   non-complying   party   and/or   its   attorneys   to
sanctions.

15. **NON-JURY TRIALS** – N/A

**At least forty-eight (48) hours prior to the final pretrial conference, or as directed by the Magistrate Judge Mark Falk,**

A.   Each party shall submit to the Court and to opposing counsel a trial brief in accordance with L. Civ. R. 7.2(b) (SEE ATTACHED "RIDER ON LENGTH OF BRIEFS") with citations to authorities cited and arguments in support of its position on all disputed issues of law. **THE BRIEF SHALL ALSO ADDRESS ANY ANTICIPATED EVIDENCE DISPUTE. FAILURE TO BRIEF ANY ISSUE, INCLUDING AN EVIDENTIARY ISSUE WHICH SHOULD HAVE BEEN ANTICIPATED, WILL BE DEEMED TO BE A WAIVER OF SUCH ISSUE.** In the event a brief is not submitted, the delinquent party's pleading may be stricken.

B.   Each party shall submit to the Court and to opposing counsel proposed Findings of Fact and Conclusions of Law.

C.   Each party shall submit to the Court and to opposing counsel any hypothetical questions to be put to an expert witness on direct examination.

16. **BIFURCATION**   (When   appropriate,   liability   issues   shall   be
        severed   and   tried   to   verdict.   Thereafter,   damage
        issues will be tried.)
        parties believe that the
     The issues of liability/compensatory damages SHALL be tried
     separately from the issue of punitive damages pursuant to
     the NJBA

-73-.

17. **ESTIMATED LENGTH OF TRIAL**

    6-8 days for liability, and 1 day for damages.

18. **TRIAL DATE** : March 2, 2010 at 9:00 am

**AMENDMENTS TO THIS PRETRIAL ORDER SHALL NOT BE PERMITTED UNLESS THE COURT DETERMINES THAT MANIFEST INJUSTICE WOULD RESULT IF THE AMENDMENT IS DISALLOWED. THE COURT MAY FROM TIME TO TIME SCHEDULE CONFERENCES AS MAY BE REQUIRED EITHER ON ITS OWN MOTION OR AT THE REQUEST OF COUNSEL.**

**COUNSEL ACKNOWLEDGE RECEIPT OF "TRIAL REQUIREMENTS OF THE HON. DENNIS M. CAVANAUGH."**

_____
(Attorney for Plaintiff)
David Zatuchni, Esq.

_____
(Attorney for Defendant)

Dated: 12/21/09

~~MARK FALK~~ (Patty Shwartz)
**UNITED STATES MAGISTRATE**

**JUDGE**