UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| LAUREEN BULL,<br><br>      Plaintiff,<br><br>v.<br><br>UNITED PARCEL SERVICE, INC.,<br><br>      Defendant. | Civ. No. 07-2291 (KM)(MCA)<br><br>OPINION<br>ON POST-TRIAL MOTIONS |

### MCNULTY, U.S.D.J.,

In this employment discrimination brought pursuant to the New Jersey Law Against Discrimination ("LAD"), N.J.S.A. §§ 10:5-1 to 10:5-49, a jury reached a verdict in Defendant's favor following a five-day trial. Thereafter, both parties filed motions for post-trial relief. I will deny the pending motions and enter Judgment in accordance with the jury's verdict.

### PROCEDURAL HISTORY

In April 2007, Ms. Bull filed this suit asserting various discrimination claims under the LAD, as well as retaliation claims, in the Superior Court of New Jersey. UPS removed the case to this Court in May 2007. Then-District Judge Dennis M. Cavanaugh[1] convened a jury trial in March 2010. On the third day of trial, Ms. Bull, on the witness stand, revealed that she possessed at home the original of a key document (a doctor's note dated June 13, 2006), which was requested by UPS in discovery but never produced. As a sanction, Judge Cavanaugh declared a mistrial and dismissed Ms. Bull's claims. The United States Court of Appeals for the Third Circuit held that the sanction of dismissal was not justified, and remanded the matter. [ECF No. 72]. The case was reassigned to me. On remand, no party pressed the issue of sanctions.

I convened a second jury trial in November 2013. The parties presented evidence for five days, after which I charged the jury to render a verdict as to the two remaining counts:

- Count One: Disability Discrimination (LAD)

---

[1] Judge Cavanaugh retired on January 31, 2014.

- Count Two: Retaliation for Filing a Worker's Compensation Claim.

The jury was instructed on the pertinent law concerning those two counts. The parties did not express any objection to the contents of the jury charge as delivered following the charge conference, and they do not challenge the jury instructions in this motion.

Plaintiff did, however, voice an objection to the wording of certain interrogatories on the jury verdict sheet, as well as the order in which certain interrogatories were asked. The interrogatories were posed to and answered by the jury as follows:

### Count 1 (Disability Discrimination)

We, the jury, find that Plaintiff Laureen Bull has proven, by a preponderance of the evidence that:

1. Ms. Bull suffered from a disability as a result of her injury. (*No finding necessary, as parties agreed*)

2. Ms. Bull was actually performing her job prior to April 4, 2006; __x__YES____NO (*Jury answered YES*).

3. Ms. Bull was terminated by United Parcel Service, Inc. (UPS); ____YES__x__NO (*Jury answered NO*).

4. In terminating Ms. Bull, UPS discriminated on the basis of her disability. ____YES__x__NO (*Jury answered NO*).

5. Ms. Bull was able to perform the essential functions of her job, either with or without a reasonable accommodation; __x__YES____NO (*Jury answered YES*).

6. UPS was aware that Ms. Bull needed a reasonable accommodation to perform the essential functions of her job; __x__YES____NO (*Jury answered YES*).

7. At the time Ms. Bull was fired, a reasonable accommodation existed that would have allowed her to perform the essential functions of her job; __x__YES____NO (*Jury answered YES*).

8. UPS wrongfully did not make such a reasonable accommodation; __x__YES____NO (*Jury answered YES*).

**If YES to ALL of the above (1 through 8), continue to number 9.**

**If NO to ANY of the above, you have FOUND IN FAVOR OF UPS on Count 1, and must skip to Count 2.**

We, the jury, find that UPS has established, with a reasonable degree of certainty, that:

9.   Prior to terminating Ms. Bull, UPS arrived at the conclusion, based on factual or scientific evidence, that employing Ms. Bull even with a reasonable accommodation would have materially increased the risk of serious harm to Ms. Bull and/or her fellow employees. ___YES ___NO (*Jury did not reach this question*).

**If YES to number 9, you have FOUND IN FAVOR OF UPS on Count 1, and should continue to Count 2.**

**If NO to number 9, you have FOUND IN FAVOR OF MS. BULL on Count 1, and should continue to Count 2.**

**Count 2 (Retaliation for Filing Worker's Compensation Claim)**

We, the jury, find that Plaintiff Laureen Bull has proven, by a preponderance of the evidence, that:

1.   UPS terminated her employment on April 4, 2006 because she made a workers' compensation claim and/or sought workers' compensation benefits. ___YES _x_NO (*Jury answered NO*).

**If YES, then you have FOUND IN FAVOR OF MS. BULL on Count 2.**

**If NO, then you have FOUND IN FAVOR OF UPS on Count 2.**

Plaintiff's objections at trial, like her current motions, pertain only to Count 1. The jury found against Plaintiff on Count 1 by virtue of its finding that UPS did not, as alleged, terminate Ms. Bull's employment and discriminate on the basis of disability. (*See* Verdict sheet Interrogatories 3 and 4). Ms. Bull is clearly disappointed that the jury found that she was not terminated, contrary to her contention since the outset of this action. (*See* Complaint at ¶ 92). She now contends, however, that the jury should never have been asked to make a separate finding as to whether she was terminated. Alternatively, she argues that the manner in which that question was posed misled the jury or misrepresented the legal import of such termination.

Accordingly, Ms. Bull seeks a new trial on the basis that the verdict sheet misled the jury as to the law, citing Rule 59. (*See* Part I, *infra*). She also complains that the jury's answers to the interrogatories as posed were mutually inconsistent. Thus she also seeks a new trial pursuant to Rule 49. (*See* Part II, *infra*). She appears to embed a motion for judgment as a matter of law within her Rule 49 motion; that motion, which she does not elaborate on, I will deny summarily.

UPS renews the motion that it made for judgment as a matter of law, pursuant to Rule 50, that it made at the close of Ms. Bull's case. UPS contends that Ms. Bull's claims are preempted by the Labor Relations Management Act, because they pertain to a valid collective bargaining agreement governing her rights as an employee. (*See* Part III, *infra*).

## FACTUAL BACKGROUND

Ms. Bull went to work for UPS in 1986 as a warehouse employee in its Edison, New Jersey facility. (Trial Testimony of Bull, 11/19/13 Tr. at 5:3-4, 6:15-17). The job is a physical one, and from time to time she was injured. (*Id.* at 8:24-9:16). On eight or nine occasions she took disability leave, the longest of which was six months. (Exs. D94-D97, D101, D104-D110). Each time, she returned to work when she was medically cleared to do so. (*See generally* Bull Testimony, 11/20/13 Tr. at 51:11-24 (regarding Ms. Bull's prior knowledge of the doctor note requirement)).

There is no dispute that Ms. Bull had an on-the-job accident on December 19, 2005. With the help of a co-worker, she was lifting overhead a package containing a snowplow. The co-worker lost her grip and the package fell on Ms. Bull, injuring her. (Bull Testimony, 11/19/13 Tr. at 10:8-16).

Soon thereafter, Ms. Bull returned to work. UPS placed her on "light duty" for a time. (*Id.* at 23:21-27:7-9). In January 2006, Ms. Bull obtained notes from Dr. Katalin Horvath and Dr. Teresa Vega stating that her lifting was restricted to 20 or 25 pounds. (11/19/13 Tr. at 20:24-27:3). After over a month of light duty work, however, she was advised to go on workers' compensation leave, which she did. (*Id.* at 27:9-15). On March 1, 2006, she saw Dr. Vega again; Vega reconfirmed the lifting restriction of 20 to 25 pounds. (*Id.* at 27:21-25). On March 15, 2006, Dr. Vega reimposed the same lifting restriction. (*Id.* at 28:1-8). Finally, on March 29, 2006, Ms. Bull got a note from Dr. Vega stating that she had reached maximum recovery and should not lift more than 10 pounds "overhead." (*Id.* at 28:12-20). The same day, Ms. Bull gave that doctor's note to her supervisor, Janet Liposky. Liposky immediately assigned Ms. Bull to the "Smalls" or "Small Sorts" department. (*Id.* at 28:21-29:14). There, Bull handled bags of packages weighing no more than ten pounds. She did not have to lift anything overhead, but rather only six inches off the floor. (*Id.* at 29:15-

4

30:12). It is fair to conclude that the jury substantially accepted the facts stated in this paragraph.

Ms. Bull testified that five days later, on April 4, 2006, upon arriving for work, she "was directed to leave the building and told that I could no longer work for UPS any more. I had to punch out and leave because of supposedly comments I made to the doctor." (*Id.* at 32:20-33:6). Supervisory personnel allegedly told her she could not work at UPS any more. (*Id.;* 11/20/13 Tr. at 17:3-25). The jury evidently did *not* necessarily accept Bull's testimony and evidence on this point, because it found that UPS never terminated her.[2]

The post-April 4, 2006 period was one of informational stalemate. Confusion reigned about matters as fundamental as whether Ms. Bull was trying to establish that she was disabled, or was not disabled. On June 13, 2006, she went to Dr. Farber, who gave her a note. This note was partially cut off in the faxing process, self-contradictory in some respects, and difficult to read in places. As to the disability, however, the thrust of the note was that Bull was capable of lifting "50 lbs. or more." (Ex. P27; Bull Testimony, 11/19/13 Transcript at 39:19-40:4).

Bull faxed that June 13 note to her union representative. (Bull Testimony, 11/19/13 Transcript at 40:5-17) Her evident intent was to demonstrate that she met job requirements (*id.* at 40:8-42:3).[3] Thereafter, however, her union representative Bob Cherney told her that the requirement

---

[2] UPS introduced corroborating evidence that there was no termination. Bull did not receive any notice of termination. In June 2006 she received a 20-year service award. She continued to receive checks for back pay, vacation pay and holiday pay as it accrued. (Exs. D66-D84). She received notices inviting her to re-enroll in the health plan. (Ex. D131).

[3] At the first trial of this matter, Ms. Bull sought to introduce a copy of this note, and UPS objected on the basis of "best evidence." Then, in open court, Ms. Bull stated that she possessed the original of this note, which had not been produced in discovery. That gave rise to the above-described mistrial and dismissal, which the U.S. Court of Appeals for the Third Circuit reversed. *See* 665 F.3d 68, 70-72 (3d Cir. 2012). Ms. Bull, apparently on her own, mailed to Judge Cavanaugh what she purported to be the originals of both the June 13, 2006 note and a subsequent August 14, 2006 note from Dr. Farber. *Id.* at 72. The parties agreed that the August 2006 note was an original, but disputed whether Ms. Bull had actually furnished the original of the June 2006 note. (*See* 4/2/13 Bissinger Ltr. [ECF No. 83]). Ultimately, before the second trial commenced, the parties agreed that Ms. Bull would only rely on the faxed copies of the two notes, and that UPS would drop its objections concerning the notes. (*See* 6/26/13 Bissinger Ltr. [ECF No. 87]). Ironically, at the second trial, Ms. Bull produced from her briefcase what she said was a termination letter, dating from long after the events in suit; by mutual agreement of the parties, this letter, which apparently was not produced in discovery by either side, was not introduced in evidence. (*See* Bull Testimony, 11/19/13 Tr. at 98:13-24).

5

of the job was the ability to lift 70, not 50, pounds. (Cherney Testimony, 11/22/13 Tr. at 30:4-31:2). As to that point, the doctor's statement that she could lift 50 pounds "or more" was ambiguous. (*See* Ex. P27). The union representative stated that if Bull obtained a doctor's note that she met job requirements, the union would pursue a grievance on her behalf. (Bull Testimony, 11/19/13 Tr. at 42:19-43:5).

Bull expressed displeasure, because she believed that the standard was 50 pounds, not 70. (*Id.* at 41:18-43:5). She testified that 50 pounds had been the standard when she was hired (*Id.* at 42:14). It had, however, been raised to 70 pounds thereafter. (Cherney Testimony, 11/22/13 Tr. at 30:12-21). She was also displeased that Cherney had not told her about the 70-pound requirement initially, before she first went to Dr. Farber. (Bull Testimony, 11/21/13 Tr. at 63:10-64:2). It appears, at least based on Cherney's recounting, that Bull believed she enjoyed a vested right to have the 50-pound standard continue to apply to her. (Cherney Testimony, 11/22/13 Tr. at 30:12-21).

Two months passed (the delay is largely unexplained). Eventually, Bull supplied her union representative with a second, revised note from Dr. Farber, dated August 14, 2006. This note was very similar to its predecessor, except that it now stated that the "Patient is not able to lift over 70 lbs." (Ex. P30; Bull Testimony, 11/19/13 Tr. at 45:17-20).] Ms. Bull faxed that August 14 note to her union representative. (Bull Testimony, 11/19/13 Tr. at 45:21-46:5). Further confusion ensued. (*See* Messina Testimony, 11/20/13 Tr. at 186:22-187:21). As with the first note from Dr. Farber, the bottom of this note was cut off in the faxing process. (Ex. P30). The date when Bull could medically return to work was given as June 14, 2006, two months *before* the date of the note. (Ex. P30). As to the disability, the note was ambiguously phrased in the negative ("*not* able to lift *over* 70 lbs"), when the evident purpose of the note was to establish that Ms. Bull *was* able to lift *up to* 70 pounds. (*Id.*).

A three-way round robin of communications among the union, UPS, and the doctor's office ensued. Ms. Bull was in touch with her union representative, trying to get them to advocate her return to work. (Cherney Testimony, 11/22/13 Tr. at 72:6-20). Sal Messina, the company's labor relations specialist, was also in touch with the union. (Messina Testimony, 11/20/13 Tr. at 151:16-152:24). Kathleen Deady, UPS's occupational nurse, got in touch with Dr. Farber's office in an attempt to obtain a clear statement as to Bull's medical condition. (Deady Testimony, 11/21/13 Tr. at 9:8-22; *see also* Ex. D7). In September, an employee at Dr. Farber's office informed UPS that the Ms. Bull had obtained the August 14 note from them, "but was not seen…she was only in [Dr. Farber's] office one time." (Ex. P28 (copy of 9/18/06 email from Denise Daniels to Kathleen Deady)) The sense of this communication was that Bull had seen the doctor in June, but not in August, when she obtained the second note. The signature on the note remained mysterious, as it was not

6

written by the doctor. The most benign interpretation of the evidence, which I am inclined to accept, is that someone in Farber's office signed it as an accommodation to Bull.

Deady had sent Dr. Farber a worksheet in an attempt to obtain a clear statement. On September 20, 2006, Dr. Farber's office faxed UPS the filled-out worksheet, which did not really clarify things. (Ex. D10). This sheet reinstated the original note's limitation of 50 (not 70) pounds, but did not explain why. (*Id.*)

On September 27, 2006, UPS sent a letter to Bull's union representative, which stated in part:

> As you know, we received two notes from Dr. Farber's office regarding Ms. Bull's ability to return to work; both notes (dated June 13, 2006 and August 14, 2006) indicate restricted duty. . . . The Company also requests that Ms. Bull produce the original notes from Dr. Farber's office due to the fact that the notes received to date are blurry and in some cases illegible.

(Ex. D13). UPS was concerned that the copies of the notes it received, faxed by Ms. Bull, did not accurately reflect the originals. The notes did have problems in the sense that they were internally inconsistent, confusing or illegible; at trial, however, the evidence did not establish any purposeful tampering, and the jury was not asked to make any specific finding as to that issue.

In September and October 2006, Cherney sent letters to Ms. Bull asking for further clarification. (Exs. D12, D14). Bull did not reply to Cherney's requests (*see* Bull tr. 11/20/13 tr. 83:23-85:13; Exs. D14, D15), and the union closed the case. (Ex. D15 (Cherney Letter of 11/3/06)). According to UPS, it never received the expected medical clarification, so it did not further pursue calling her back or designing an accommodation.

### *EEOC claim and outcome*

Meanwhile, on May 12, 2006, Bull had filed a workers compensation claim. One doctor examined her in November 2006 and found she was 45% permanently disabled, with injuries to the neck and shoulder. (Ex. D115). Another found she was 66 2/3% disabled. (Exs. D132, D133). The company doctor found her 7½% disabled. (Ex. D45). These results were not submitted to the union or UPS; the workers compensation case proceeded on a parallel and independent course. In 2010, Bull testified in the comp case that she was unable to put on a blouse, pull weeds, or perform other simple tasks. (Bull Testimony, 11/20/13 Tr. at 35:20-36:13). On June 8, 2012 the workers comp claim was settled for a lump sum payment of $22,956. (Exs. P39, P40; *see also* Bull Testimony, 11/19/13 Tr. at 65:6-66:23).

## DISCUSSION

### I. Whether a New Trial is Warranted Because the Jury Verdict Sheet Improperly Asked, Or Asked In An Improper Format, Whether Plaintiff was Terminated

Ms. Bull's first argument is that she is entitled to a new trial based on inadequacies in the jury verdict sheet. (*See* Pltf.'s Br. in Supp. Motions at Point I, p. 15). She does not contend that there was any error in the court's instructions to the jury regarding the applicable law.

### A. The Applicable Standards

Rule 59 provides that "[t]he court may, on motion, grant a new trial on all or some of the issues—and to any party— (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court; or (B) after a nonjury trial, for any reason..." Fed. R. Civ. P. 59(a)(1). "Any error of law, if prejudicial, is a good ground for a new trial." 11 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure Civil § 2805 (3d Ed. 2012). For an error of law to warrant a new trial, it must affect a party's substantial rights. Fed. R. Civ. P. 61. An error in the jury charge, or in the jury verdict sheet and its component interrogatories, may furnish grounds for a new trial. *See DeWitt v. New York State Hous. Fin. Agency*, 1999 U.S. Dist. LEXIS 13057 at *9-13 (S.D.N.Y. Aug. 24, 1999). As a general matter, "[t]he decision whether to grant a new trial pursuant to Federal Rule of Civil Procedure 59(a) lies within the district court's sound discretion." *Inter Med. Supplies v. EBI Med. Sys.*, 975 F. Supp. 681, 686 (D.N.J. 1997) (citing *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980)).

Jury interrogatories are authorized by Federal Rule of Civil Procedure 49. "The formulation of jury interrogatories is entrusted to the discretion of the trial judge." *Armstrong v. Dwyer*, 155 F.3d 211, 216 (3d Cir. 1998). "The only limitation [on this discretion] is that the questions asked of the jury be adequate to determine the factual issues essential to the judgment." *Id.* (quoting *McNally v. Nationwide Ins. Co.*, 815 F.2d 254, 266 (3d Cir. 1987)); *see also Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 245-46 (3d Cir. 2006)). In assessing such adequacy, the court may consider the instructions it issued to the jury. *See Kant v. Seton Hall Univ.*, 279 Fed. App'x. 152, 160 (3d Cir. 2008). The essential question is whether the jury lacked adequate guidance from, or was misguided by, the instructions and verdict sheet it received from the court, such that it can be said that the movant's substantial rights were affected. *United States v. 564.54 Acres of Land*, 576 F.2d 983, 987-

988 (3d Cir. 1978), *rev'd on other grounds*, 441 U.S. 506 (1979); *Inter Med. Supplies*, 975 F. Supp. at 698 (denying motion for new trial because error in the verdict sheet did not lead "jury to mistake the burden of proof" and "jury was properly instructed on the relevant law.").

Thus the issue is whether any error in the verdict sheet here affected Ms. Bull's substantial rights by inadequately or incorrectly guiding the jury's findings as to essential issues.

### B. State Law Governing A Failure-to-Accommodate Claim and the Jury Charges, to Which Plaintiff does not Object

At trial, I agreed with Ms. Bull that her cause of action for discrimination under the New Jersey LAD arises under the legal framework for a claim of failure to accommodate, a subcategory of employment discrimination.

That requires some explanation. Plaintiff did not affirmatively plead "failure to accommodate" in her complaint. UPS, however, countered Ms. Bull's "handicap discrimination" claim by proffering that she was physically unable to perform her job. Under New Jersey Supreme Court precedent, that defense raises the issue of whether UPS offered a reasonable accommodation to Ms. Bull before taking adverse employment action. *See Viscik v. Fowler Equipment Co.*, 173 N.J. 1, 19-20 (2002).

The basic elements of handicap discrimination by way of a wrongful failure to accommodate are that plaintiff (1) has a disability, (2) is otherwise qualified to perform the essential functions of the job, with or without a reasonable accommodation, and (3) "nonetheless suffered an adverse employment action because of the disability." *Seiden v. Marina Assoc.*, 315 N.J. Super. 451, 465-66 (Law Div. 1998). That statement of the essential elements of a LAD failure-to-accommodate claim closely mirrors that of the Third Circuit in a case brought under analogous federal law. *See Shiring v. Runyon*, 90 F.3d 827, 831 (3d Cir. 1996) (holding that an actionable failure to accommodate is established by a showing that plaintiff (1) was disabled, (2) was able to perform the essential functions of the job, either with or without an accommodation, but (3) was "nonetheless terminated or otherwise prevented from performing the job," subject to defendants' establishment, as an affirmative defense, that a reasonable accommodation would constitute an undue hardship).

In *Seiden*, for example, the plaintiff suffered from chronic leg pain. When asked to work a later shift, he informed his employer that his pain increased late in the day. He asked for an accommodation, but was moved to the later shift anyway. As a result he regularly called in sick and was eventually fired for excessive absenteeism. *Id.* at 456-458. The court, addressing this fact pattern, viewed it as a claim of "discrimination due to a failure to accommodate a handicap." *Id.* at 455.

*Seiden* drew an important distinction between failure-to-accommodate cases, like this one, and disparate treatment cases. A failure-to-accommodate case is not subject to the *McDonnell Douglas* analysis of disparate treatment.[4] To the contrary, where "the employer denies an employee an opportunity to continue employment because the employee suffers from a disability that could reasonably be accommodated, but is not, regardless of how other employees are treated, that in itself is an unlawful employment practice and a violation of LAD." *Id.* (citing N.J.S.A. § 10:5-29.1). The *Seiden* court analyzed the plaintiff's "claim[] [that] as a result of the refusal to accommodate him, he was fired," and held that "[t]hese facts, if proven, amount to an unlawful employment practice…the harm to be remedied is the adverse employment action which resulted from the failure to accommodate." *Id.* at 465.

Finally, as the parties agreed, when a disability is claimed, and before any adverse employment action is taken, an employer and an employee have a duty to engage in an interactive discussion in an attempt to find an appropriate reasonable accommodation. Failure to confer is not necessarily dispositive of the case, but the jury may take such evidence into account. *See Tynan v. Vicinage 13 of Superior Court*, 351 N.J. Super. 385, 400-401 (App. Div. 2002); *Mengine v. Runyon*, 114 F.3d 415, 420-421 (3d Cir. 1997); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317-318 (3d Cir. 1999).

I instructed the jury in accordance with the principles cited above. (*See generally* Court's Instructions to Jury, 11/26/13 Tr. at 2:9-29:17). There is no contention that the court's jury charges, as delivered, contained any legal error.

### C. Analysis of Plaintiff's Contentions

Ms. Bull contends that, although the court's jury instructions were legally correct, the verdict sheet in effect incorporated an erroneous view of the law.

First, Ms. Bull contends that an employer's failure to provide a reasonable accommodation *is* adverse employment action. The state case law cited above presents the accommodation element and the resulting adverse employment action (commonly, termination) as separate elements. But they may, Bull says, be the same thing. Implicit in Bull's first argument is a contention that "termination" was superfluous to her case. In her account, the

---

[4] *McDonnell Douglas* requires that a plaintiff show "(i) that he belongs to a [protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (U.S. 1973); *see also Maher v. New Jersey Transit Rail Operations, Inc.* 125 N.J. 455, 480-81 (1991)(stating disparate treatment test in disability discrimination setting).

10

jury's finding that UPS failed to accommodate her disability is sufficient; its negative answer to the question whether she was terminated is irrelevant.

Second, Bull contends that adverse employment action (here, termination) is not an independent consideration, but merely the *harm* that emanates from the employer's failure to reasonably accommodate. Thus, she says, the question of whether she was terminated (assuming it should have been posed at all) should not have been posed separately. The termination issue should have been combined with the "accommodation" issue in a single question, in a manner that reflected their "proper causal relationship." Implicit in Bull's second argument is an attempt to fuse the concepts of "reasonable accommodation" and "termination." In her account, the two *must* rise or fall together, and the jury should not have been given interrogatories that allowed them to—as they did—find the first but not the second. The jury, she says, was denied the opportunity to find "causation" between the two.

### 1. The parties presented termination as a contested factual issue, and the jury was properly asked to resolve it

The above arguments boil down to a contention that termination of employment, as such, is a superfluous consideration. Failure to accommodate, Ms. Bull says, is itself sufficient to make her case. In the alternative, she argues that failure to accommodate and termination should have been combined and presented to the jury in a causal context.

One threshold problem with these contentions is that they are inconsistent with the manner in which Bull postured the issues for decision before trial, in the pretrial order, and in the first, abortive trial. Whether or not an adverse employment action *must* involve termination, Ms. Bull always contended that the adverse employment action in her particular case *was* termination. The fact, or not, of termination was a hotly contested factual issue. The parties jointly submitted "termination" to the court as a factual issue that the jury would have to resolve, yes or no.

Thus the "LIST OF LEGAL ISSUES" in the PTO began as follows:

1. Whether UPS terminated plaintiff's employment on April 4, 2006, due to her disability.

2. Whether UPS terminated plaintiff's employment on April 4, 2006, because she sought workers' compensation benefits.

(PTO p. 64). One of Bull's key factual contentions in the Pretrial Order was that, on or about April 4, 2006, a UPS supervisor told her that "you no longer work for UPS." (PTO ¶94). She was adamant in the face of UPS's denials that she had been "terminated." (*Id.* at ¶102. In short, Bull consistently maintained,

11

as to both of her causes of action, that she was *fired, in so many words, on April 4, 2006.*

Bull also presented termination as a separate *legal* element of her case. In her trial brief, Bull stated the legal elements of her *prima facie* case of failure to accommodate as follows: "1. She was disabled within the meaning of the law; (2) she was qualified to perform the duties of his position and had been performing [ ] her work at a level that met UPS legitimate expectations; and (3) she nevertheless *had been fired.*" (Pltf.'s Tr. Brf. pp. 2-3 (emphasis added) (citing *LaResca v. American Tel. & Tel.*, 161 F. Supp. 2d 323, 329 (D.N.J. 2001)). As Bull acknowledged in her presentation of the legal issues to the Court, the issues of failure to accommodate and termination ("firing") are not fused in the case law; the former is element 2 and the latter is element 3. She asserted, correctly in my view, that the employer was obligated to consider and discuss "reasonable accommodation <u>before</u> firing, demoting or refusing to hire or promote a person with a disability...." (*Id.* at p. 6). And the jury was so charged, at the parties' request and without objection. (*See* Court's Instructions to Jury, 11/26/13 Tr. at 12:16-14:16).

According to Bull's presentation of her case, on March 29, 2006, UPS received a doctor's note saying that she could lift no more than ten pounds overhead. And five days later, on April 4, 2006, without discussing a reasonable accommodation with her, UPS fired her—*i.e.*, told her explicitly that she did not work there any more.[5]

Interrogatories 3 and 4, concerning termination, were not necessary, according to Ms. Bull; because adverse action is not necessarily termination, the jury should not have been asked about it. But termination *is the particular adverse action that Bull was claiming.* Again and again, she stated that the jury would have to determine whether she was fired on April 4, 2006.

Given the sharply focused and highly contested factual issue of whether UPS fired Bull on April 4, 2006, it seemed best to ask the jury directly whether termination had occurred. The jury interrogatories did no more than ask the jury whether the facts as alleged by Bull were true. The jury answered "No." It agreed that UPS had not offered a reasonable accommodation, but also found that UPS *never fired Bull, as she had alleged.*

---

[5] Counsel for Ms. Bull also contended, in his closing argument to the jury, that UPS's actions amounted to a termination in fact, even if UPS did not explicitly fire her. (Summation of Mr. Zatuchni, 11/25/13 Tr. at 95:25-97:7). Bull never requested that the jury be instructed as to, *e.g.*, constructive discharge. The court's instructions did not rule out such a theory of termination, however. Counsel was free to, and did, argue it as a commonsense inference. (*See id.*).

Plaintiff now posits that a set of facts different from the one she alleged might also have entitled her to relief; the jury interrogatories were erroneous, she says, because they did not explicitly pose an alternative scenario under which she might prevail. But the jury instructions fairly presented the jury with the facts as she asserted them. And in fairness to the defendant, the Court could not permit the plaintiff's case to be such a moving target.

The jury's finding that the alleged "firing" never occurred exploded Plaintiff's simple scenario. Of course, UPS, presented with a doctor's note, could not respond by simply firing Plaintiff—but, as the jury found, UPS did not do that.

Why, then, would the Plaintiff present the issue as one of "firing" if there are other circumstances under which UPS could nevertheless have been found liable? No doubt because those other circumstances were fraught with highly complicated issues. For example, as the jury was explicitly instructed, when a disability arises, both the disabled employee and the company must cooperate in good faith in an interactive process to design a reasonable accommodation. (Court's Instructions to Jury, 11/26/13 Tr. at 16:13-21).

Because—as the jury found—UPS did not immediately fire Plaintiff, the matter necessarily entered, or should have entered, that "discussion" phase. And that directly implicates the ensuing cycle of miscommunication and the notes from Doctor Farber's office. As to that, the jury could readily have found that UPS did not refuse to explore or discuss the issue. Rather, the evidence painted a picture of someone who was placed on medical leave but stubbornly remained in limbo, failing to take the necessary steps to provide the employer proper medical evidence, or even a clear statement of position, as to her ability to return to work (whether on an accommodated or un-accommodated basis). To be sure, many of Plaintiff's difficulties might have been attributable, not to herself, but to her doctor or her union representative—but Plaintiff did not sue her doctor, and she did not sue her union for breach of the duty of fair representation. She sued UPS for discrimination, and she alleged, unsuccessfully as it turned out, that UPS fired her on April 4, 2006.

### 2. Combining the elements of reasonable accommodation and adverse action/termination

Plaintiff's arguments, as noted above, rely on the merging of the issues of reasonable accommodation and termination. For the reasons stated above, the factual issues as presented properly called for a pure jury finding, yes or no, as to whether plaintiff was fired. But setting that aside, I now discuss the notion that the verdict sheet's isolation of the question of termination was erroneous because it did not define termination as something caused by a failure to accommodate. (*See* Pltf's Br. Supp. Mot. at pp. 19-20).

That issue is most sharply presented by Plaintiff's second issue, *i.e.*, the objection to the order and wording of the jury interrogatories. Plaintiff objected to Interrogatories 3 and 4, contending that they should be replaced by an alternative, proposed interrogatory. Plaintiff's proposed interrogatory, inserted after the current Interrogatory 8, would have asked whether "UPS terminated Ms. Bull without making a required reasonable accommodation, and thereby discriminated on the basis of disability." (Tr. of Trial, 11/26/2013 Tr. at p. 34-35).[6]

First, the case law, including the much-relied-upon *Seiden*, firmly establishes that adverse employment action must be shown in order to prove discrimination by failure to accommodate. And, at least thus far, the New Jersey courts have never merged the two elements of failure to accommodate and adverse employment action. *See Seiden*, 315 N.J. Super at 461 (actionable discrimination exists where the employee "is not reasonably accommodated <u>and</u> suffers an adverse employment action..."); *Shiring*, 90 F.3d at 831; discussion of elements at pp. 9-10, *supra*.

The New Jersey Supreme Court, in dicta, has "refrain[ed] from resolving [] whether a failure to accommodate unaccompanied by an adverse employment consequence may be actionable." *Victor v. State*, 203 N.J. 383, 422 (2010). It acknowledged the possibility of an actionable failure to accommodate despite the lack of any "identifiable" adverse action. Yet it did not rule affirmatively. *See id.*; *see also Durham v. Atl. City Elec. Co.*, 2010 U.S. Dist. LEXIS 103998, 28-29 (D.N.J. Sept. 28, 2010) (Kugler, J.). Plaintiff seizes upon this reservation of the issue; but the issue was pretermitted, not decided, by the New Jersey Supreme Court. Absent a state Supreme Court decision, the case law cited above, which is contrary to plaintiff's position, is my best guide. I can discern no trend that would allow me to predict confidently that the New Jersey Supreme Court would decide this issue in a manner favoring plaintiff here.[7]

---

[6] *See also* Pltf's Br. Supp. Mot. at 19 ("UPS's failure to provide such a reasonable accommodation resulted in and/or caused an adverse employment action/ termination/ loss of employment to Ms. Bull.") This formulation, in Plaintiff's post-trial brief, perhaps better expresses the objection, but it is not precisely the one that Plaintiff proposed at trial.

[7] "[I]n the absence of guidance from the state's highest court, we must look to decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue," as well as considered dicta, scholarly works, and other sources of information. *Norfolk Southern Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 92 (3d Cir. 2008) (quoting *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1445 (3d Cir. 1996)).

And of course I am doubly reluctant to predict a state court's holding as to issues that plaintiff did not squarely present factually in this case.

Second, nothing in *Seiden* or any of the cited materials supports Plaintiff's view that an employer who does not immediately accommodate the employee based on a doctor's note has *ipso facto* terminated the employee, satisfying the adverse action element. Even the *Victor* court's dicta stop short of any such rule of law. Under currently prevailing law, asking the jury whether Ms. Bull was terminated was not only proper, but required.

Third, the rule proposed by Ms. Bull would subvert the requirement that an employer, faced by a claim of impairment, must enter into a dialogue with the employee in an attempt to work out whether a reasonable accommodation is feasible, before taking adverse employment action. See p. 10, *supra* (citing *Tynan*, 351 N.J. Super. at 400-01; *Mengine*, 114 F.3d at 420-421; *Taylor*, 184 F.3d at 317-18). If failure to provide an immediate accommodation were tantamount to termination, then the time for pre-termination dialogue would be over before it began. That concern about jumping the gun is especially appropriate in a case like this one, where plaintiff, even in her complaint, did not specifically assert failure to accommodate, but only general "handicap discrimination." The reasonable accommodation issue entered this litigation when UPS asserted, as a defense, that Bull was unable to perform her job. See p. 9, *supra* (citing *Viscik v. Fowler Equipment Co.*, 173 N.J. 1, 19-20 (2002)).

Fourth, there is no support for Plaintiff's view that causation is an element of the cause of action, unexpressed in the case law but nevertheless fundamental, which links the second and third elements. Nothing in the case law requires the Court to set up termination as something which, by its nature, *results from* reasonable accommodation and therefore must be considered as part of a single package. *Seiden's* dicta lends an scintilla of support to Plaintiff's view, 315 N.J. Super at 465 (stating that "the harm to be remedied is the adverse employment action which resulted from the failure to accommodate"). I take this, however, to mean that the adverse employment action "resulted" from the failure to accommodation in the sense that the employer fired (or otherwise penalized) the employee because of the employee's un-accommodated disability. I do not take it to mean that failure to accommodate and adverse employment action are the same thing, or that the existence of the first implies the second. *Seiden's* formulation of the elements omits any mention of causation; it uses a simple, conjunctive 'and' to separate the element of plaintiff's ability to work with an accommodation from the element of adverse action, *id.* at 461 ("is not reasonably accommodated <u>and</u> suffers an adverse employment action..."), 465-66 (listing three essential elements). Plaintiff's counsel was free to argue about the relationship of the elements. But because causation is not an element, there is no error in the court omitting words such as 'caused' or 'resulted from,' or in placing

15

interrogatories about termination before (or after) those about reasonable accommodation. In sum, nothing about the interrogatories misrepresents or fails to adequately set forth the essential elements of Plaintiff's claim for the jury's consideration. *McNally,* 815 F.2d at 266; *United States v. 564.54 Acres of Land,* 576 F.2d at 987-988; *Inter Med. Supplies,* 975 F. Supp. at 698.

Plaintiff's contentions rise or fall with her expanded view of the law, which I do not accept. The motion comes nowhere near establishing that the particular wording of the interrogatories, which is within the court's discretion, introduced legal error or unfairly prejudiced her case. The proposed alternative interrogatories differ in wording, but not in legal substance, from the verdict sheet that was used. And the verdict sheet that was used follows the issues as Plaintiff presented them, and the elements as established in the New Jersey case law.

The motion for a new trial based on the wording of the jury interrogatories is therefore denied.

### II. Whether the Jury's Answers to the Verdict Sheet's Interrogatories are Inconsistent, Warranting Judgment Notwithstanding the Verdict or a New Trial

Ms. Bull's second argument is that "the jury's interrogatory answers in the verdict sheet are irreconcilable and inconsistent with each other, thus necessitating a directed verdict in favor of Ms. Bull or a new trial." (Pltf's Br. Supp. Motion at Point II, p. 21). Ms. Bull states that the jury's answers to Interrogatories 3 and 4 (finding no termination and thus no discrimination) are "entirely inconsistent" with its answers to Interrogatories 5 through 8 (finding that UPS failed to reasonably accommodate Ms. Bull's disability). "[B]oth findings cannot be true at the same time or otherwise co-exist with each other," says Plaintiff. (*Id.*).

This motion is brought pursuant to Federal Rule of Civil Procedure 49. In particular, Ms. Bull contends that Rule 49(b)(4) applies. (*Id.*). It provides that:

> When the answers [to verdict sheet interrogatories] are inconsistent with each other and one or more is also inconsistent with the general verdict, judgment must not be entered; instead, the court must direct the jury to further consider its answers and verdict, or must order a new trial.

Fed. R. Civ. P. 49(b)(4). In this situation, "two choices are open to the district court. It may return the jury for further consideration of its answers and verdict, or it may order a new trial. No immediate judgment may be entered when the jury's answers are inconsistent with each other and one or more is

inconsistent with the general verdict, however." 9B Charles Alan Wright and Arthur R. Miller, Federal Practice and Procedure Civil § 2513, n.22-23 (3d Ed. 2008). Indeed, directing a verdict is an option only where the jury's answers are internally consistent with each other, but inconsistent with the general verdict. *See* Fed R. Civ. P. 49(b)(3).

First, I rule out judgment as a matter of law notwithstanding the verdict. Ms. Bull claims that the answers are inconsistent with each other, a situation that permits, at most, a new trial. *See* Fed. R. Civ. P. 49(b)(4). Ms. Bull also fails to argue that the answers are "inconsistent with the general verdict." *See* Fed. R. Civ. P. 49(b)(4). Her contention seems to be that one answer is, and the other isn't.

I turn to the new trial motion, with the proper Rule 49 standard in mind. Ms. Bull's complaint that the jury's findings are mutually inconsistent rests on her legal contention that a failure to reasonably accommodate *is* termination. Therefore, she reasons, a jury cannot answer "yes" to one interrogatory and "no" to the other. As discussed above, however, even *Seiden*, the case on which she relies, holds that adverse employment action is a separate element, and nowhere suggests that it is automatically fulfilled if the element of failure to accommodate is established. 315 N.J. Super at 461, 465.

Accordingly, I will deny this component of Plaintiff's post-trial motion as well.

### III. Whether UPS was Entitled to Judgment as a Matter of Law On the Basis of Preemption by Federal Labor Law

UPS cross-moves for judgment as a matter of law, renewing the Rule 50 motion it made at the close of Plaintiff's case and incorporating by reference the papers it filed at that time. The gist of UPS's argument is that the Ms. Bull's LAD claims necessarily require interpretation of the terms of the collective bargaining agreement (CBA) to which she was a party. Thus, says UPS, Section 301 of the Labor Management Relations Act (LMRA) preempts Ms. Bull's LAD suit and requires her to pursue the dispute resolution mechanisms set forth in the CBA. In support, UPS cites a number of references to the CBA in the evidence at trial. (Dfd's Br. Supp. Mot. Dir. Verdict (ECF No. 98) at pp. 4-21).

LMRA preemption arises from the provision stating: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce . . . may be brought in any district court of the United States having jurisdiction of the parties." LMRA § 301, 29 U.S.C. § 185(a). The Supreme Court has held that "questions relating to what the parties to a labor agreement agreed, and what legal consequences

were intended to flow from breaches of that agreement, must be resolved by reference to uniform federal law, whether such questions arise in the context of a suit for breach of contract or in a suit alleging liability in tort." *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985). Thus, Section 301 preemption comes into play where "resolution of a state-law claim depends upon the meaning of a collective-bargaining agreement." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 406 (1988).

Such preemption, however, is limited in scope: "Not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is preempted by § 301 or other provisions of federal labor law . . . it would be inconsistent with congressional intent under that section to pre-empt state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract." *Lueck* 471 U.S. at 211-212. The LMRA thus has no preemptive effect where there are "state rules that proscribe conduct, or establish rights and obligations, independent of a labor contract," *id.* at 212, or "where the state law claim can be resolved without substantially interpreting the collective bargaining agreement itself." *Id.* at 220; *see also Lingle*, 486 U.S. at 409-10. The relevant inquiry is whether "resolution of Plaintiff's claim [] require[s] 'interpretation' of the [relevant] CBA," or at least will "involve 'a substantial issue of construction and operation of the CBA[.]'" *LaResca v. AT&T*, 161 F. Supp. 2d 323, 330-31 (D.N.J. 2001) (Bassler, J.). That a case involves "reference to or consideration of the terms of a collective-bargaining agreement" does not warrant preemption, as this does not signal that the litigated issues require interpretation of the CBA. *Id.* at 330 (quoting *Ramirez v. Fox Television Station, Inc.*, 998 F.2d 743, 749 (9th Cir. 1993)). A court must, on a "case by case basis," determine whether the state law claims are "inextricably intertwined with considerations of the terms of the labor contract." *Lueck*, 471 U.S. at 213, 220.

Applying the principles cited above, judges of this Court have held that "[s]tate discrimination laws are generally not preempted by federal labor law." *LaResca*, 161 F. Supp. 2d at 330. Echoing earlier precedent from this district, *LaResca* "concluded that the LAD was not pre-empted by § 301 of the LMRA because 'state law discrimination claims under the NJLAD are derived independently from state law, and not from the obligations assumed by the parties under the labor agreements.'" *Id.* (quoting *Carrington v. RCA Global Communications, Inc.*, 762 F. Supp. 632, 641-42 (D.N.J. 1991) (Debevoise, J.)).

In *LaResca*, a plaintiff who had suffered epileptic seizures was asked to work a night shift. Because he could no longer drive and required public transit that was unavailable late at night, he requested as an accommodation that he be put on the day shift. Eventually he was terminated. Defendant, in response to his state law discrimination claim, argued that the requested accommodation was not feasible because "Article 38 of the 1995 CBA, which

mandates that shifts be assigned based on seniority, precluded it from granting Plaintiff's request for change to a day shift." *Id.* at 329. Judge Bassler rejected that preemption argument. There was no real dispute over the meaning or validity of the CBA; rather, the defendant, like UPS here, asserted it as a defense to its failure to offer a reasonable accommodation. The issue, in short, was failure to accommodate, not seniority. *Id.* at 331.

Here, UPS asserts that "multiple provisions of the CBA were presented and discussed in the trial evidence." (Dfd's Br. Supp. Mot. Dir. Verdict at pp. 4-9). For example, the jury's consideration of "termination" would naturally invoke the CBA's termination procedures. Ms. Bull's entitlement, or not, to see a third party doctor, and other matters of medical procedure, are similarly governed by the CBA. UPS cites other, similar examples.

The CBA may have been relevant to the determination of certain issues of fact, but there is no dispute about what it says, what it means, whether it is valid, or whether Ms. Bull is bound by it. Like the defendant in *LaResca*, UPS cites the CBA to bolster its case and justify its actions. That is perfectly permissible, but it does not transform this case into one about, or arising from, the CBA. Rather, this is a state-law LAD case based on "rules that proscribe conduct" and on "establish[ed] rights and obligations, independent of a labor contract," *Lueck* at 211-212. Whether Ms. Bull was reasonably accommodated or terminated are factual issues as to which the CBA is relevant, but not determinative. Ms. Bull's LAD claims are not preempted by virtue of the CBA. *Cf. LaResca*, 161 F. Supp. 2d at 330; *Carrington*, 762 F. Supp. 632, 641-42.

Accordingly, I will deny the motion of UPS pursuant to Rule 50.

## CONCLUSION

For the reasons stated above, In accord with the above determinations, I shall **DENY** Plaintiff's motion for judgment notwithstanding the verdict and/or a new trial. I shall also **DENY** Defendant's renewed motion for a directed verdict based on preemption. I shall enter Judgment in accord with the jury's verdict in favor of Defendant.

Dated: Newark, New Jersey
       July 1, 2014

*/s/ Kevin McNulty*
HON. KEVIN MCNULTY, U.S.D.J.